**COMMON SENSE ALLIANCE,**
an unincorporated Colorado
association, Plaintiff,

v.

Donetta DAVIDSON, Secretary of State
for the State of Colorado; Kenneth Sa-
lazar, Attorney General for the State of
Colorado; Mac Myers, District Attorney
for the Ninth Judicial District, State of
Colorado; and John M. Ely, County At-
torney for the County of Pitkin, State of
Colorado, Defendants.

No. 99SA76.

Supreme Court of Colorado,
En Banc.

March 13, 2000.

Isaacson, Rosenbaum, Woods & Levy, P.C., Edward T. Ramey, Melissa K. Thompson, American Civil Liberties Union Foundation of Colorado, Mark Silverstein, Denver, Colorado, Attorneys for Plaintiff.

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Alan J. Gilbert, Solicitor General, Maurice G. Knaizer, Deputy Attorney General, State Services Section, Denver, Colorado, Attorneys for Defendants Secretary of State and Attorney General.

No appearance by or on behalf of defendants Mac Myers and John M. Ely

Justice KOURLIS delivered the Opinion of the Court.

Pursuant to C.A.R. 21.1, we agreed to answer several questions certified to us by the United States District Court for the District of Colorado. The questions arise out of a civil action currently pending in the United States District Court in which a political organization, Common Sense Alliance (CS Alliance), contests the application and interpretation of certain reporting provisions of the Fair Campaign Practices Act (the FCPA).

Central to the contested issues before the United States District Court is the question of whether CS Alliance is an "issue committee" under the terms of the FCPA. A group of individuals in Pitkin County originally formed CS Alliance in 1996 as a "political action committee" for political purposes such as supporting candidates, protecting constitutional principles, and curbing governmental powers. In 1997 and 1998, the group became active on a particular ballot issue by drafting and promoting an initiative. The FCPA defines "issue committee" as two or more persons who have associated themselves for the purpose of supporting or opposing a ballot initiative, and imposes reporting and disclosure requirements on issue committees. It also sets out criminal sanctions for failure to comply with those requirements.

The first certified question asks whether an organization formed for other purposes may later become an issue committee as defined by the FCPA. If an organization can evolve into an issue committee, the second question asks at what point in time the group becomes subject to the statute's requirements, and the third question asks which contributions must be disclosed.

We conclude that the statute is insufficiently clear to include CS Alliance within the reach of the issue committee definition. The statute contains no guidance as to when a committee formed for another purpose would be deemed to become an issue committee; when its contributors would become subject to the disclosure requirements; or even which of its contributors would need to be disclosed.

Were we to interpret the statute broadly, any political or special interest organization could become an issue committee through a decision of its leadership to support or oppose a ballot initiative without the assent or perhaps even the knowledge of its members. Such a decision would then trigger the reporting and disclosure requirements and would make public the names and financial contributions of the members of the organization. Because constitutional rights concerning freedom of association and freedom of speech are implicated, we decline to give the statute that broad reading and decline to provide judicial answers to the questions left unanswered in the statute. We, therefore, answer the first certified question in the negative. As a result, it is unnecessary for us to answer the second and third certified questions.

I.

A.

Residents of Pitkin County, Colorado who were interested in influencing local government formed CS Alliance in May 1996. The group describes itself as "a loosely organized

unincorporated association primarily of residents of the Roaring Fork Valley in central Colorado." At the time of its formation, CS Alliance's Mission Statement listed three goals: "protecting constitutional principles, curbing governmental powers, and improving participation in the electoral process." Its bylaws describe the group as a "political action committee," advancing causes consistent with its Mission Statement. Neither the Mission Statement nor the bylaws appear to make any reference to activities the group might undertake in supporting or opposing ballot issues or questions.

CS Alliance is managed by a seven-person executive council that guides CS Alliance in pursuing its objectives. There are no formal membership requirements, and anyone who appears at one of CS Alliance's periodic meetings has a voice and may participate in the determination of any action to be taken.

CS Alliance is generally inactive except at election time, when it engages in a variety of activities on a number of different public issues. Since its formation, the group has conducted public issue discussions and nonpartisan candidate forums, endorsed candidates for various local offices, and conducted voter registration drives during state elections. CS Alliance also published its position with respect to a number of issues, including eleven different ballot questions before the electorate.[1]

Beginning in November 1996, CS Alliance turned its attention to local ballot issues regarding mass transportation. Pitkin County and the City of Aspen had placed a referred matter proposing the creation of a rail line between Glenwood Springs and Aspen on their local ballots. CS Alliance opposed light rail, supporting the creation of a bus lane between the two towns instead. CS Alliance advertised its position on the "Entrance to Aspen issue,"[2] drafted and published a proposed substitute local ballot initiative, and

invited members of the community to attend a meeting to discuss the ballot issue.

The CS Alliance initiative would have required Pitkin County and the City of Aspen to obtain financing by a certain date for the proposed rail system between Aspen and Glenwood Springs. Failing that, the initiative would have required the local governments to refrain from further efforts to obtain financing for the project. Further, if Pitkin County and Aspen did not obtain financing for the light rail system, the two governments would have been required to transfer land to the state so that the state could widen State Highway 82, which runs between Glenwood Springs and Aspen. Thus, in effect, the initiative provided an alternate means of traveling between Glenwood Springs and Aspen by the addition of a bus lane instead of travel by light rail.

On July 20, 1998, CS Alliance submitted its proposed ballot issue to the Pitkin County Clerk and Recorder. CS Alliance's proposal ultimately became Ballot Question 100 on the November 1998 Pitkin County and City of Aspen ballots. On October 15, 1998, CS Alliance ran an advertisement in the *Aspen Daily News* in support of Pitkin County Ballot Question 100 and in opposition to the government-referred measures in support of light rail. CS Alliance's treasurer also sent an email to local residents soliciting funds for use in the ballot issue campaign. Four contributors to CS Alliance requested anonymity, in two cases out of "fear that their employment or civic service might be negatively affected if their contributions were known."

### B.

CS Alliance's activities triggered an administrative complaint by defendant John M. Ely, the County Attorney for Pitkin County, Colorado, against CS Alliance for violations of the FCPA's reporting procedures. Ely

---

1. At various times in its history, CS Alliance opposed amendments to Pitkin County's home rule charter that would have required petitions to be signed by registered voters instead of just eligible electors, increased the salaries of county commissioners, and established a $500 limitation on contributions to candidates or political committees. The group opposed ballot questions increasing property taxes and imposing a use tax

to fund roads and widen Highway 82 between Aspen and Glenwood Springs. It also opposed zoning restrictions in rural areas.

2. Together, the various ballot issues or questions were commonly referred to as the "Entrance to Aspen issue."

transmitted his complaint to the Secretary of State, who referred the matter to the Colorado Division of Administrative Hearings. The Division set the matter for a hearing before an administrative law judge (the ALJ).

The ALJ took evidence, and on October 29, 1998, issued an "Agency Decision." The ALJ found that CS Alliance was not an issue committee before July 20, 1998, but that "[b]eginning by approximately July 20, 1998, . . . advocacy regarding the three ballot issues which were the subject [of] Mr. Ely's complaint became 'the major or primary purpose' of Common Sense Alliance's activities." The ALJ noted that by July 20, 1998, CS Alliance was "accepting contributions and making expenditures almost exclusively to support or oppose this ballot question and the two related ballot questions."[3] Because CS Alliance "became an issue committee," as defined by section 1–45–103(8), 1 C.R.S. (1999), the group should have registered and filed the disclosure statements required by section 1–45–108, 1 C.R.S. (1999). The ALJ therefore concluded that CS Alliance failed to comply with the registration and reporting requirements of the FCPA. The ALJ thus referred the matter to the Attorney General and local district attorney for appropriate enforcement action, pursuant to section 1–45–111(2)(a), 1 C.R.S. (1999).[4]

## C.

The decision of the ALJ led to the case now pending before the United States District Court. CS Alliance brought an action against defendants Donetta Davidson,[5] Kenneth Salazar, Mac Myers, and John M. Ely, seeking declaratory and injunctive relief under 42 U.S.C. § 1983 (1994). CS Alliance claims that the FCPA's registration and reporting requirements for issue committees violate the First and Fourteenth Amendments to the Constitution of the United States, both on their face and as applied to CS Alliance. See U.S. Const. amends. I, XIV. CS Alliance also seeks a preliminary and permanent injunction against the defendants, prohibiting them from taking any enforcement action against it under the FCPA.

By his certification order dated January 28, 1999, Judge John L. Kane requested this court to exercise its original jurisdiction and answer three questions of law. See C.A.R. 21.1. In his order, Judge Kane stated that "[a]ll parties . . . acknowledge that the federal constitutional issues turn in the first instance upon the validity of the [ALJ's] statutory interpretation" of the FCPA. The order further noted that "no definitive interpretation of these statutory provisions has heretofore been made by the Courts of the State of Colorado." Noting that the statutory interpretive questions may be dispositive of the federal litigation and "in recognition of the guidance provided to [lower federal courts] by the Supreme Court of the United States in *Arizonans for Official English v. Arizona*, [520 U.S. 43] 117 S.Ct. 1055, 1072–75 [137 L.Ed.2d 170] (1997)," the federal court requested our intervention to answer the legal questions posed. By our order dated March 4, 1999, we accepted the following questions as framed by the United States District Court:

---

3. The parties to this action stipulated that CS Alliance was not an issue committee before July 20, 1998, when CS Alliance submitted to the Pitkin County Clerk what later became Ballot Question 100.

4. That section reads, in relevant part, as follows:

Any person who believes that a violation of this article has occurred may file a written complaint with the secretary of state. . . . The secretary of state shall hold a hearing on the complaint before an administrative law judge. . . . If the administrative law judge determines that such violation has occurred, the secretary of state shall so notify the attorney general and appropriate district attorney who

may institute appropriate legal action against the alleged offender.
§ 1–45–111(2)(a).

5. CS Alliance originally named Victoria Buckley as a defendant. However, during the course of this litigation, Donetta Davidson has succeeded to the office formerly held by Buckley. Since Buckley was sued in her official capacity only, Donetta Davidson has been substituted as a party by force of law under our rules of appellate procedure. See C.A.R. 43(c)(1) ("When a public officer is a party to an appeal or other proceedings in the appellate court in [her] official capacity and during its pendency . . . ceases to hold office, the action does not abate and [her] successor is automatically substituted as a party.").

(1) Does an association which was formed and operated for purposes other than "accepting contributions or making expenditures to support or oppose any ballot issue or ballot question" become an "issue committee" as defined in C.R.S. § 1–45–103(8) if, at a future point in time, it engages in those activities with regard to a specific ballot issue or ballot question?

(2) If the answer to the preceding question is in the affirmative, at what point in time does such an association become an "issue committee?"

(3) If the answer to the first preceding question is in the affirmative, when and to what extent must such an association comply with the disclosure requirements contained within C.R.S. § 1–45–108? Specifically, must the association file a disclosure of the identities and amounts contributed by all of its donors, as well as a specification of all of its expenditures, whether or not those contributions and expenditures are related or unrelated to the ballot issue or ballot question involved? If not, what disclosures are required?

## II.

The Fair Campaign Practices Act is a part of the important campaign finance reform movement. The FCPA itself was a citizen-initiated ballot question intended to avoid corruption and the appearance of corruption in political campaigns by limiting the influence of wealthy contributors and special interest groups.[6] The FCPA imposes contribution limits and disclosure requirements on candidate committees, political committees, political parties, and issue committees.[7] *See* §§ 1–45–101 to –118, 1 C.R.S. (1999). In this case, we address only the narrow issue of whether CS Alliance falls within the purview of the FCPA's reporting requirements for issue committees.

The FCPA defines an issue committee as:

two or more persons who are elected, appointed, or chosen, or have associated themselves, *for the purpose of accepting contributions and making expenditures to support or oppose any ballot issue or ballot question.* "Issue committee" does not include political parties, political committees, or candidate committees as otherwise defined in this section.

§ 1–45–103(8) (emphasis added). Although issue committees are not subject to the contribution limits of the FCPA, they are subject to the reporting requirements. Issue committees must report to the appropriate officer "their contributions received, including the name and address of each person who has contributed twenty dollars or more; expenditures made; and obligations entered into by the committee or party." § 1–45–108(1), 1 C.R.S. (1999). Further, an issue committee must register with the appropriate officer before accepting or making any contributions. *See* § 1–45–108(3). Failure to comply with these requirements may constitute a class two misdemeanor criminal violation. *See* § 1–45–113(1), 1 C.R.S. (1999). In addition to other sanctions, the violator is liable for double the amount contributed or received in violation of the statute. *See* § 1–45–113(2), 1 C.R.S. (1999). If the Attorney General fails to sue the violator within ninety days after the complaint is filed, the complainant has a private right of action to do so. *See* § 1–45–111(2)(b), 1 C.R.S. (1999).

**6.** The people of Colorado adopted the FCPA in 1996 by a vote of 928,148 to 482,551. *See* § 1–45 ed. note (1), 1 C.R.S. (1999).

**7.** The United States District Court for the District of Colorado recently struck several portions of the FCPA as unconstitutional restraints on free speech and association. *See Citizens for Responsible Gov't State Political Action Comm. v. Buckley,* 60 F.Supp.2d 1066 (D.Colo.1999). The court invalidated the statute's aggregate contribution limits to campaign committees and political committees. *See id.* at 1082–89. The court upheld, however, the statute's provisions limiting political committee contributions to candidate committees, limiting the uses of unexpended campaign contributions, and limiting contributions to and from political parties. *See id.* at 1090–98 (finding that statutory sections did not violate either the First Amendment or the Equal Protection Clause). This decision currently is on appeal to the Tenth Circuit Court of Appeals. *But cf. Nixon v. Shrink Mo. Gov't PAC,* —— U.S. ——, 120 S.Ct. 897, 908–10, 145 L.Ed.2d 886 (2000) (upholding state limits on campaign contributions as sufficiently tailored to the state's interests).

## III.

The first certified question asks whether an organization, like CS Alliance, may become an issue committee under section 1–45–103(8) of the FCPA by accepting contributions or making expenditures to support or oppose a ballot issue, so that the organization is then subject to the Act's disclosure and reporting requirements.

CS Alliance argues that it is not an issue committee because the statute on its face includes only committees formed for the purpose of accepting contributions or spending money to support or oppose a ballot issue. The State responds that an association originally formed for another purpose may evolve into an issue committee when it begins activity on a ballot issue, and therefore, CS Alliance violated the FCPA.

### A.

■ Answering the first certified question requires us to construe the statute defining "issue committee." In construing the statute, "we look first to the statutory language, giving words and phrases their plain and ordinary meaning." *Colorado Common Cause v. Meyer*, 758 P.2d 153, 160 (Colo. 1988); *see also Bolt v. Arapahoe County Sch. Dist. No. Six*, 898 P.2d 525, 532 (Colo.1995) (holding that to determine the will of the people in adopting an initiative, terms should be given their plain meaning).

As a threshold matter, we note that the FCPA governs those "who are elected, appointed, or chosen, or have associated themselves, for the purpose of" opposing a ballot issue. *See* § 1–45–103(8). The plain language of the statute appears to limit its application to those associations created and intended for the purpose of participating in ballot initiative campaigns. Hence, an initial reading of the statute would lead to the conclusion that because CS Alliance was formed for another purpose, it cannot evolve into an issue committee.[8]

■ We are left with two alternatives: follow the plain language of the FCPA, or read into the statute language such as

"formed *or operating* for the *primary* purpose of supporting or opposing a ballot initiative." However, we must proceed with care in adding language to a statute. *See e.g., Schlessinger v. Schlessinger,* 796 P.2d 1385, 1389 (Colo.1990) (holding that the court should be careful to avoid judicial legislation by adding to a statute that which the legislature did not deem proper); *In re Great Outdoors Colorado Trust Fund,* 913 P.2d 533, 540 (Colo.1996) (stating that when courts construe an initiative, "any intent of the proponents that is not adequately expressed in the language of the measure will not govern the court's construction of the amendment."); *Citizens for Responsible Gov't State Political Action Comm. v. Buckley,* 60 F.Supp.2d 1066, 1082 (D.Colo.1999) ("The court is 'not free to fine tune the limits established' by the FCPA.")

Indeed, we conclude that there are a number of reasons why we must decline to read such additional language into the statute.

### B.

The first reason is that both the language of other sections of the FCPA and the history of the development of the law in this area support a narrow construction. For example, the definitions of both issue committee and political committee expressly exclude the other. *See* §§ 1–45–103(8), –103(10)(a), 1 C.R.S. (1999). These exclusions suggest that a single entity may carry only one classification, and pursue only one purpose. A committee formed to support or oppose an initiative is distinct from a committee formed to make contributions to a political candidate. If we were to find that an association may have many purposes under the statute, then the exclusionary language segregating an issue committee from a political committee makes no sense. The exclusionary language of the definitions also indicates that the statute defines issue committee narrowly and should encompass only those activities listed by the Act.

Additionally, if were we to hold that an organization may have multiple purposes, we

---

**8.** The definition of "associate" buttresses this reading. To associate "[s]ignifies confederacy or union for a particular purpose." *Black's Law Dictionary* 121 (6th ed.1990).

would effectively create a legal fiction in which groups continually dissolve and reform each time the members decide to pursue a new task. Such an understanding is fraught with problems of identification, notice, and the absence of common understanding among the members of the organization.

More persuasively, the statutory language governing issue committees has evolved in a way that suggests a narrow reading. In 1988, this court found language that is conspicuously absent from the current FCPA to be dispositive on the question of how a group should be classified under Colorado's Campaign Reform Act of 1974 (the CCRA), the predecessor to the FCPA. In *Colorado Common Cause,* this court resolved the question of whether a for-profit corporation could become a "political committee" under the aegis of the CCRA's reporting and disclosure requirements. *See* 758 P.2d at 164. The definition of political committee on which the court focused read:

> "Political committee" also includes a separate political education or political action fund or committee which is associated with *an organization or association formed principally for some other purpose and includes an organization or association formed principally for some other purpose insofar as it makes contributions or contributions in kind or expenditures.*

*Id.* at 160 (quoting § 1–45–103(10), 1B C.R.S. (1980)). The court concluded that because the language of the statute included associations formed for some other purpose, such language should also be read to include for-profit corporations.

> In our view, the most plausible construction of the language "an organization or association formed for some other purpose" is that the statutory definition of a "political committee" was intended to include a for-profit corporation insofar as such corporation makes contributions, con-

tributions in kind, or expenditures to or on behalf of a political candidate or issue. *Id.* at 162.

In 1996, well after *Colorado Common Cause,* the FCPA created the issue committee classification and omitted from its definition, and that of political committee as well, any mention of an organization or association "formed principally for some other purpose." *Compare* § 1–45–103(8), 1 C.R.S. (1999), *with* § 1–45–103(10), 1B C.R.S. (1980).[9] The FCPA also omitted the reference to persons who have "cooperated" for the purpose of accepting contributions and making expenditures for a ballot issue.

■ The electorate, as well as the legislature, must be presumed to know the existing law at the time they amend or clarify that law. *See Bickel v. City of Boulder,* 885 P.2d 215, 228 n. 10 (Colo.1994) (noting that the general rules of statutory construction apply when interpreting citizen-initiated measures); *see also Cooper v. People,* 973 P.2d 1234, 1239 (Colo.1999) ("We presume that the General Assembly was familiar with our previous interpretations of statutes and with the common law when it enacted the statute in question."); *Vaughan v. McMinn,* 945 P.2d 404, 409 (Colo.1997) ("The legislature is presumed to be aware of the judicial precedent in an area of law when it legislates in that area."); *City & County of Denver v. Rinker,* 148 Colo. 441, 446, 366 P.2d 548, 550 (1961) (opining "that there is a presumption that all laws are passed with knowledge of those already existing"). Thus, the electorate may be presumed to have consciously omitted the provision including groups formed for other purposes from the regulation of issue committees.

### C.

■ We observe that a narrow interpretation of the definition of "issue committee" is

---

9. We find the omission of the "formed principally for some other purpose" text especially significant in light of another change to the definition. Under the FCPA, a group must be formed "for the purpose of accepting contributions *and* making expenditures" in order to be considered an issue committee. § 1–45–103(8) (emphasis added). Contrarily, the CCRA used "or" instead of

"and," forcing contributing businesses that did not accept contributions to register. *See Colorado Common Cause,* 758 P.2d at 163. This slight modification alone eliminated the registration consequences of the CCRA. Therefore, the omission of "formed principally for some other purpose" speaks to the scope of the definition.

not inconsistent with the larger purpose behind the FCPA. One of the best guides to legislative purpose is an act's declaration of policy. *See Colorado Common Cause*, 758 P.2d at 162. The FCPA's legislative declaration identifies the principal concern of the Act as "large campaign contributions to political candidates." § 1–45–102, 1 C.R.S. (1999). In *Citizens for Responsible Government State Political Action Committee*, the federal district court determined that the FCPA's legislative goals were avoiding corruption and the appearance of corruption, limiting the amount of money in campaigns, and balancing the influence of special interest groups. *See* 60 F.Supp.2d at 1078–79.[10] Accordingly, the FCPA focuses on identifying a candidate's ties and allegiances as well as placing limits on campaign contributions.[11] The FCPA's legislative declaration appears to focus on political candidates and does not mention ballot issues or issue committees. *See* § 1–45–102.

As currently written, the FCPA assures disclosure of information regarding large contributions to candidate campaigns. The purposes served by disclosure of that information do not propel a conclusion that CS Alliance should also be subject to the same disclosure provisions. The identity of supporters and opponents of a ballot initiative would be potentially helpful to the electorate, but the information is not nearly as critical as the identity of candidate supporters. As the Supreme Court has stated: "The risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue." *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 790, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (citation omitted). This is because "ballot initiatives do not involve the risk of 'quid pro quo' corrup-

tion present when money is paid to, or for, candidates." *Buckley v. American Constitutional Law Found., Inc.*, 525 U.S. 182, 203, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999); *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 352, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). Thus, our reading of the definition of "issue committee" does not contravene the electorate's efforts to implement broad campaign finance reform, particularly as to candidate elections.

### D.

█ In matters of statutory construction, we of course must also consider the consequences of our interpretation. *See Colorado Common Cause*, 758 P.2d at 161–62. As the State points out, a reading of the plain language of the statute may allow some organizations to slip past the disclosure requirements by forming for another purpose and then switching activities to focus on ballot questions. While this loophole in the statute may be troubling, it is one created by the drafting of the FCPA, and we are bound by the Act's plain language. This is a statutory problem that cannot be mended by judicial fiat. We, therefore, must resist the temptation to change the statutory language, and rather must leave any repair to the General Assembly or the electorate.

### IV.

Lastly, we are constrained in any broad or inclusive reading of the statute by the constitutional concerns raised in the United States District Court proceeding. Although those issues are not technically before the court given the limited nature of the certification, they wait in the wings and necessarily impact our consideration.[12]

---

**10.** The FCPA's declaration of policy expresses concern that "large campaign contributions to political candidates allow wealthy contributors and special interest groups to exercise a disproportionate level of influence over the political process," as well as concern over the rising costs of campaigning for political office. § 1–45–102. The federal district court held, however, that the state's legitimate interests were limited to avoiding corruption and the appearance of corruption. *See Citizens for Responsible Gov't State Political Action Comm.*, 60 F.Supp.2d at 1082. The state's other interests were not compelling

enough to support regulation that would restrict free speech and association. *See id.* at 1079.

**11.** In contrast, the legislative declaration of the Colorado Campaign Reform Act focused on the benefits of disclosure, including fostering an informed public, garnering the trust of the electorate, and increasing public confidence in elected officials. *See* § 1–45–102, 1B C.R.S. (1996).

**12.** We stress that we are not ruling on the constitutional issues, but rather are addressing them

We deal here with an individual's decision to support or oppose a ballot measure, and the extent to which that association or choice should be required to be publicly disclosed. A vote for or against a ballot measure is most assuredly an exercise of free speech; an economic contribution to a committee designed to support or oppose a ballot measure is similarly of constitutional magnitude. *See Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 299–300, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981). "Contributions by individuals to support concerted action by a committee advocating a position on a ballot measure is beyond question a very significant form of political expression." *Id.* at 298, 102 S.Ct. 434. The rights of free speech and free association are necessarily implicated whenever an individual's membership in an association and his or her political contributions to that association's causes become the subject of public disclosure. *See Buckley v. Valeo*, 424 U.S. 1, 64–65, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

Hence, we must proceed with caution and with an insistence upon specificity as to the circumstances under which disclosure is required. *See Citizens Against Rent Control*, 454 U.S. at 294, 102 S.Ct. 434; *Baggett v. Bullitt*, 377 U.S. 360, 372, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."); Laurence H. Tribe, *American Constitutional Law* § 12–31 at 1034 (2d ed.1988). The First Amendment demands specificity so individuals may assess the burden on their rights to free speech and free association, and make an informed decision. *See Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) ("[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.").

Therefore, the members of CS Alliance should have advance notice of the conse-quences of their political activities and be able to anticipate the extent to which their political associations and activities will become a matter of public knowledge. If we construe the FCPA to permit CS Alliance to evolve into an issue committee, the supporters of CS Alliance will not have had the benefit of choosing whether they wish to contribute to an organization required to make public disclosures. Ballot propositions are often among the most divisive and controversial public issues. Therefore, "[i]t is quite probable that one who advocates an unpopular position would be most reluctant to exercise his right of free speech if his name, [and] address ... will become a matter of public record." *Messerli v. State*, 626 P.2d 81, 86 (Alaska 1980). It is possible that members could suffer consequences from disclosure. For example, under some circumstances membership affiliations can cause individuals to lose their jobs or suffer threats of bodily harm. *See e.g., Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 99, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982); *NAACP v. Alabama*, 357 U.S. 449, 462, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *New York Civil Liberties Union, Inc. v. Acito*, 459 F.Supp. 75, 88 (S.D.N.Y.1978). Certainly an individual should have a choice in determining whether to engage in a process that results in public disclosure of affiliation.

The benefits of disclosure are many, including aiding electors in evaluating candidates and issues, deterring corruption, and checking the influence of affluent special interest groups. *See American Constitutional Law Found., Inc.*, 525 U.S. at 202, 119 S.Ct. 636. However, the right of the electorate to be informed on how public issue campaigns are financed, and by whom, must be balanced against the rights of free association and free speech of an organization's members. *See McIntyre*, 514 U.S. at 345–47, 115 S.Ct. 1511. The General Assembly or the electorate must decide how to accommodate each of these basic rights. That expression of legislative intent would then define the state's interest. In the instance of candidate campaigns, the FCPA provides clear and specific direction as only for the purpose of answering the certified questions.

to the balance of these rights in the disclosure and contribution limit provisions. The statute does not reveal any such clear evaluation of the proper equipoise of these rights with respect to issue committees.[13]

## V.

Because we answer the first certified question in the negative, it is unnecessary for us to reach the merits of the second and third issues. We do note, however, that the second and third questions themselves serve to highlight the difficulties we would encounter were we to adopt a broad construction of the statute.

The second certified question asks: if an organization may become an issue committee some time after formation, when does it become subject to the reporting requirements? The answer to this question is not apparent from the statutory scheme. In order to provide an answer, this court would be required to fix the precise point in time at which a group becomes an issue committee, in addition to setting the quantum of proof necessary to meet that standard. For example, is a decision by a board of directors of an organization to support or oppose an initiative a manifestation of intent to become an issue committee, or must there be an actual expenditure of funds? Further dilemmas arise as well. Since an issue committee and a political committee are distinct, does an organization that chooses to support or oppose an initiative thereby preclude itself from acting as a political committee? The statute is silent on these issues and any resolution would require this court to step beyond the scope of its duty to interpret, rather than create, the law. *See e.g., Schlessinger,* 796 P.2d at 1389.

Similar pragmatic difficulties spring out of the third certified question: if an organization becomes an issue committee, then to what extent is it subject to the FCPA's disclosure requirements? The statute provides no guidance as to whether only those contributions that are segregated or earmarked must be disclosed, or whether every donation must be reported. If we were to hold that the organization must only disclose donations specified for a ballot purpose, then how would an organization that decided to support or oppose an initiative, yet received no contributions earmarked for that purpose, comply? Would the organization disclose the money it spent, but identify no donors for that money?

Providing an answer to the third certified question also would bring us back to the constitutional concerns outlined above. If this court were to require CS Alliance to report all contributions, then the organization would disclose the names of contributors whether or not those people donated money knowing of the decision to support or oppose an initiative. Many associations, organized for some other broad purpose, could choose to contribute money to support or oppose an initiative. Examples that quickly come to mind might be the League of Women Voters or the Sierra Club. The decision-making process of such an entity must necessarily, because of the size of the organization, comprise only a few individuals. Those few individuals could make a decision to expend money to support an initiative campaign: a decision they felt to be completely consistent with the organization's overall purpose. However, few of the members of the organization would have any idea that the decision had been made and that the group's purpose could have changed according to the statute. It would be not only onerous for the association, but also intrusive for the individual members, if the FCPA then required the organization to disclose the names and addresses of each member who had at any point in time contributed more than $20.00.

The immense practical difficulties in answering certified questions two and three reinforce our conclusion that the electorate did not fully consider the treatment of issue

13. In addition to leaving open the question of the scope of the disclosure provisions, *see supra* Part III, the statute does not address the extent to which the limitation on independent expenditures applies to issue committees. *See* § 1–45–

107, 1 C.R.S. (1999). The FCPA also does not appear to impose aggregate contribution limits on donations to ballot initiative campaigns. *See* § 1–45–104, 1 C.R.S. (1999).

committees under the FCPA. Because we cannot tell by the terms of the statute when CS Alliance might have become an issue committee, or which contributions it would then be required to disclose, we must necessarily hold that CS Alliance is not an issue committee at all.

## VI.

In conclusion, we hold that the FCPA covers only those issue committees that were formed for the purpose of supporting or opposing a ballot initiative. Organizations that form for another purpose and later commit to ballot issue activity are not within the clear ambit of the statute. Although this conclusion may allow some organizations to avoid disclosure under the current FCPA, to hold otherwise would be to fill in gaps in the legislation in a manner that invites constitutional problems.

Accordingly, we answer the first certified question in the negative, decline to answer the second and third certified questions, and return this opinion to the United States District Court for further proceedings.

Justice SCOTT dissents, and Justice MARTINEZ joins in the dissent.

Justice SCOTT, dissenting:

"For of all sad words of tongue or pen, the saddest are these: 'It might have been!'" These words ring as true in this case regarding a 1996 citizen initiative seeking campaign reform as when they were first penned by John Greenleaf Whittier.[1]

I agree with the majority that in 1996 "[a] group of individuals in Pitkin County originally formed [Common Sense] Alliance ... for political purposes," maj. op. at 749, and that "in 1997 and 1998, the group became active on a particular ballot issue by drafting and promoting an initiative." *Id.* I also agree with the majority that "constitutional rights concerning freedom of association and freedom of speech are implicated" in laws imposing campaign finance reform. Maj. op. at 749. I further agree that the Fair Campaign Practices Act "imposes reporting and

disclosure requirements on issue committees ... [and] sets out criminal sanctions for failure to comply with those requirements." *Id.* at 749. However, I cannot agree with the majority that "the statute is insufficiently clear to include [Common Sense] Alliance within the reach of the issue committee definition." Maj. op. at 749. Therefore, I must respectfully dissent.

### I. The Purpose of Colorado's Fair Campaign Practices Act: Sunlight and Public Disclosure

There is much to be said for the wisdom of Justice Louis Brandeis and the application of that wisdom here today: "Publicity is justly commended as a remedy for social ... [wrongs]. Sunlight is said to be the best of disinfectants, electric light the most efficient policeman." Louis Brandeis, *Other People's Money and How the Bankers Use It* 62 (Harper & Row 1967) (1914).

### A.

By passing Colorado's Fair Campaign Practices Act, the electorate most certainly intended to require those who "come together as partners, friends, or companions" to affect the outcome of elections to disclose contributions and expenditures; our citizens sought nothing more and nothing less. By an overwhelming vote of 928,148 to 482,551, the Fair Campaign Practices Act was adopted through a citizen-initiated ballot measure in our 1996 general election.

Previously, citizens were unable to obtain sufficient campaign reform through efforts to petition their representatives in the political branches of government. Therefore, in 1996, our citizens took refuge from this failure to act through the Colorado Constitution and its reservation of the right of citizen initiative. *See* Colo. Const. art. V, § 1. Thus, citizens proposed and adopted reforms setting forth certain requirements for political "issue committees," including notice and disclosure of independent expenditures, reporting of contributions and expenditures, and registering with the secretary of state.

---

**1.** John Greenleaf Whittier, "Maud Muller" *in The*     *Complete Poetical Works of Whittier* 47–48 (1894).

To be sure, of course, these reforms constitute a modest disclosure requirement for candidate support committees and certain special interest groups, in particular issue committees that act to affect the outcome of Colorado elections. This campaign reform effort was straightforward. We are not here called upon to address the wisdom of or necessity for campaign finance reform. We are also not here to decide whether such reform is unconstitutional, the issue not certified to us but more properly remaining before the United States District Court, the Honorable John Kane presiding. Within the scope of our acceptance of certification, in my view we are only to disclose to the United States District Court what our citizens intended by answering the questions certified to and accepted by this court. Hence, I would leave questions of constitutional dimension or that have implications under the First Amendment of the United States Constitution for the United States District Court. I would not, in effect, attempt to usurp its authority by exceeding the scope of Colorado Appellate Rule 21.1, which limits our review to "questions of law of this state." [2]

### B.

In 1996, to make their actions and intent clear, "[t]he people of the state of Colorado" concluded and "declare[d] that large campaign contributions ... allow wealthy contributors and *special interest groups* to exercise a disproportionate level of influence over the political process." § 1–45–102, 1 C.R.S. (1999) (emphasis added). Thus, in 1996, four years before candidates now running for national office would propose campaign finance reform as a national concern, the Colorado electorate concluded "that the interests of the public are best served by ... *full and timely disclosure* of campaign contributions, and *strong enforcement of campaign laws*." *Id.* (emphasis added).

2. C.A.R. 21.1 provides in relevant part: "The Supreme Court may answer questions of law certified to it by [a federal court] ... if there is involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court

The purpose of such campaign reform is to secure the elective and political process and thus to protect the interests of citizens from undue influence by special interest groups. As was most recently stated by the United States Supreme Court addressing state regulation of elections and upholding such reforms, "[l]eave the perception of impropriety unanswered, and the cynical assumption that large donors call the tune could jeopardize the willingness of voters to take part in democratic governance." *Nixon v. Shrink Mo. Gov't PAC,* —— U.S. ——, 120 S.Ct. 897, 906, 145 L.Ed.2d 886 (2000).

Today, however, the majority's judgment and its opinion, in my view, fail to fairly construe the intent of the electorate. I therefore cannot join in the majority's result for at least two fundamental reasons. First, the majority obliterates the citizens' plain effort to answer their "perception of impropriety," simply in anticipation of legal issues not ripe for our resolution. Second, in its effort to construe our Fair Campaign Practices Act, the majority consciously reads out of the statute the term, "have associated themselves," which in my view would cause any reasonable reader to conclude that Common Sense Alliance is an "issue committee." That phrase, absent in the majority's examination of our statute, otherwise cures the defect it finds in the plain and straightforward language. Finally, as noted above, the United States Supreme Court has most recently affirmed the authority of states to regulate political campaigns by the use of contribution limits, which by their nature must necessarily include contribution disclosure that the majority seeks to avoid. *See Shrink Mo. Gov't,* 120 S.Ct. at 901 (*"Buckley [v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), is] authority for ... state regulation" of political campaigns).

The majority denies the citizens of Colorado the full force and effect of their substantial and popular efforts at campaign reform.[3]

there is no controlling precedent in the decisions of the Supreme Court."

3. This campaign finance reform received the highest number of votes of any of the twelve issues on the statewide ballot. *See* State of Colorado Abstract of Votes Cast 1995–1996, published by Victoria Buckley, Secretary of State.

Further, in my view, the decision of the majority to "decline to give the statute [a] broad reading," maj. op. at 749, to answer the statutory interpretation questions we agreed to address is unsound and its reliance upon the legislative history of a repealed act unpersuasive.

## II. Certification under C.A.R. 21.1

### A.

By accepting certification of the legal questions posed to us by the United States District Court, we agreed, in essence, to decide questions regarding the intent of the electorate when adopting section 1–45–103(8), 1 C.R.S. (1999). We undertook to decide whether, under the Fair Campaign Practices Act (FCPA), the people of Colorado intended to exclude from the definition of "issue committee," and therefore except from disclosure requirements, an organization that admits that it is organized and operates today "for the purpose of accepting contributions and making expenditures to support or oppose ... ballot issue[s] or ballot question[s]." To meet its purpose it actively accepts contributions and makes expenditures to support or oppose ballot questions. Because "two or more persons ... associated themselves" to do so, I do not believe we are powerless to give effect to section 1–45–103(8) and the campaign reform that government failed to provide, but which citizens sought through the initiative process. Therefore, I cannot follow the analysis of the majority, which fails in obvious fashion to address the particular language of the statute that clearly includes the conduct of Common Sense Alliance (CS Alliance), the issue committee before us.

Under the Colorado Constitution the people have reserved to themselves the power to adopt legislation when their representatives are unable or refuse to so act. *See* Colo. Const. art. V; § 1. In light of that important reservation of authority, I find the minimal regulation here reasonable, especially in light of the Supreme Court's decision in *Nixon v. Shrink Missouri Government,* despite the majority's reliance, instead, upon *Citizens for Responsible Government State Political Action Committee v. Buckley,* 60 F.Supp.2d 1066 (D.Colo.1999). *See* maj. op. at 752 n. 7.

Unlike the majority, I would answer the first question in the affirmative. In doing so, I see the Fair Campaign Practices Act as a sufficient citizen effort merely to place into the sunlight the contributions of those with wealth and to turn on the light of public disclosure, placing in plain view the political expenditures of the powerful and others "associated" for that purpose. This, in my view, is reasonable self-governance that is neither too complex for us to understand nor so onerous as to unduly burden the rights of those who wish to affect the outcome of Colorado political elections.

### B.

The majority is reluctant "to provide judicial answers to the questions left unanswered in the statute" in part because it concludes that "constitutional rights concerning freedom of association and freedom of speech are implicated" by the FCPA's disclosure requirements. Maj. op. at 749. The constitutionality of the FCPA, however, is not the issue before us. That issue is pending before the federal district court. While the federal district court certified questions of state law to us, that certification did not abdicate the federal district court's jurisdiction to decide the constitutional question that will then resolve the dispute in the federal, not our state, court.

C.A.R. 21.1 permits us to answer certified questions only "if there is involved in any proceeding before [the federal court] questions of law *of this state* which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of [this court]." (Emphasis added.) If a certified question requires consideration of any law other than Colorado's, we should not agree to answer it.

In this case, we agreed to determine whether, under Colorado law,

an association which was formed and operated for purposes other than "accepting contributions or making expenditures to support or oppose any ballot issue or ballot

question" become[s] an "issue committee" as defined in C.R.S. § 1–45–103 if, at a future point in time, it engages in those activities with regard to a specific ballot issue or ballot question.

Implicitly, by accepting this certified question, we agreed to answer it. My vote to do so contemplated our resolution of this question solely on the basis of state law. *See Campbell v. Orchard Mesa Irrigation Dist.,* 972 P.2d 1037, 1038 n. 3 (Colo.1998) ("Our answer to the certified question should be limited by the record and the question of law certified for determination."); *Garman v. Conoco, Inc.,* 886 P.2d 652, 661 (Colo.1994) (Erickson, J., concurring) (same); *see also Coleman v. Thompson,* 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ("[O]ne court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter.") (internal quotation marks omitted).

In my view, our review of federal constitutional issues is beyond the scope of the questions certified and should not be applied, as it is a legal matter over which the federal district court's determination is not subordinate to our holdings. *See People v. Barber,* 799 P.2d 936, 940 (Colo.1990) (per curiam) (noting opposite proposition, that lower federal courts' decisions are not conclusive on state courts, even on questions of federal law).

Thus, I cannot accept the majority's decision to refrain from answering the very question certified to us by assuming the answer to the ultimate question before the district court.

### III. The Majority Fails to Follow the Plain Language

The fundamental question in this proceeding is one of intent: By adopting section 1–45–103(8), did the people of Colorado intend to exclude from the definition of "issue committee" an organization that accepts contributions and makes expenditures to support or oppose a ballot issue or question solely because at some earlier date, prior to engaging in such conduct, it was originally formed

for some other stated purpose? I cannot agree with the majority that they did.

The statute, by its plain language, reaches an "associat[ion]" of two or more persons when it accepts campaign contributions and makes expenditures to support or oppose a ballot issue or question in an upcoming election. *See* § 1–45–103(8) (providing that an issue committee exists when two or more persons "have associated" in order to support or oppose a ballot issue). My reading of section 1–45–103(8) and other provisions of the FCPA fails to disclose any exclusion from the definition of "issue committee" based on an organization's prior activities.

The majority correctly notes that in order to determine the electorate's intent in passing an initiated measure, we turn first to the plain language of the measure. *See Zaner v. City of Brighton,* 917 P.2d 280, 283 (Colo. 1996) ("When construing a[n] [initiated] constitutional amendment courts must ascertain and give effect to the intent of the electorate adopting the amendment."); *Urbish v. Lamm,* 761 P.2d 756, 760 (Colo.1988) (same); *see also Bickel v. City of Boulder,* 885 P.2d 215, 228 n. 10 (Colo.1994) (construing a statute adopted by initiative according to the same or analogous rules for construing a statute adopted by the General Assembly). Thus, "[i]f the [electorate's] intent is immediately conveyed by the commonly understood and accepted meaning of the statutory language, we need look no further." *Farmers Ins. Exch. v. Bill Boom Inc.,* 961 P.2d 465, 469 (Colo.1998). Yet it is also true that statutes must be construed as a whole. *See People v. District Court,* 713 P.2d 918, 921 (Colo.1986) (*Matthews* ).

The flaw in the majority's reasoning is that it ignores entirely a critical phrase in the definition of issue committee—"*associated for the purpose.*" (Emphasis added.) An examination of that phrase leads to a construction of the statute that is no doubt closer to the electorate's intention in adopting the initiative, which after all is our primary task in construing an initiated measure. *See Colorado Common Cause v. Meyer,* 758 P.2d 153, 160 (Colo.1988); *Matthews,* 713 P.2d at 921.

The statute itself does not define "associated." We thus rely on the plain and ordinary meaning of that term. *See Colorado Common Cause*, 758 P.2d at 160. To associate, according to Webster's Dictionary, is *"to come or be together* as partners, friends, or companions." *Webster's Ninth New Collegiate Dictionary* 110 (1985) (emphasis added). Thus, individuals who "have associated themselves" for a particular purpose would ordinarily include people who are currently pursuing, together as "friends[ ] or companions," an identifiable purpose. Such "companions," then, may pursue that purpose as a formal or informal organization or group, without the necessity of following corporate or other formalities, including carrying out that purpose without articles of association and without any stated purpose. This is true even when the two or more persons so associated originally formed the group for a different reason, but have now arrived at a different purpose for their association.

The majority is driven by a rationale that attempts to avoid allowing the actions of individual members or agents, acting together, to bind the organization to a particular purpose and subject it unwittingly to potential sanctions. It is basic Hornbook law that refutes the reasoning from which the majority result springs. Courts in most jurisdictions readily acknowledge the ability of an agent or a person with apparent authority to bind his or her principal to a third party. *See* Harold Gill Reuschlein & William A. Gregory, *The Law of Agency and Partnership* § 13, at 33 (2d ed.1990). Nonetheless, strict concepts of agency applicable to partnerships would not subject associations like CS Alliance to liability under the FCPA. "An agent may have the power to bind his principal in a contract with a third person although he may not have the authority to do so." *Id.* Nevertheless, while this may be true under strict concepts of agency and contract law, I would not apply that notion under my reading of the FCPA.

Generally, then, unauthorized actions by a group within a larger group would not subject the entire group to the FCPA's registration and disclosure requirements. Rather, the smaller group of associated persons would itself become an issue committee, with the concomitant registration and disclosure requirements. If, for example, a renegade group of five members of the Sierra Club decided, in the Sierra Club's name, but without its authorization, to collect and spend money in support of a ballot question, actions taken in pursuit of that decision would not subject the entire Sierra Club to the FCPA's registration and disclosure requirements. Only the smaller, renegade group would then be required to register as an issue committee and disclose its contributions and expenditures.

Our laws regarding unincorporated associations, including partnership and agency law, provide a useful analogy here. A partnership is formed upon "the association of two or more persons to carry on as co-owners of a business for profit," regardless of whether the partners formalize their agreement with a written document. § 7–64–202(1), 2 C.R.S. (1999). Under long-standing Colorado law, a partnership is formed at the time of the agreement to associate; it requires no formal proceedings. *See Yoder v. Hooper,* 695 P.2d 1182, 1187 (Colo.App.1984), *aff'd,* 737 P.2d 852 (Colo.1987); *see also Grau v. Mitchell,* 156 Colo. 111, 114, 397 P.2d 488, 489 (1964) (defining partnership as a "contract, *express or implied,* between two or more persons ... to place their money, effects, labor[,] or skill ... into a business") (emphasis added). Admittedly, the analogy to a partnership is not complete, as organizations like CS Alliance are not entrepreneurial enterprises. Nonetheless, these types of organizations, like partnerships, are unincorporated associations.

In sum, the term "associated" should be permitted its full force in the common usage, as clearly the citizens must have intended. I would find that each time two or more persons cause CS Alliance to change its goals or purpose and agree to accept contributions and make expenditures for purposes of supporting or opposing a ballot issue, the resultant association becomes an "issue committee." As a consequence, the purpose of the original association would be irrelevant for purposes of determining whether or not at a

later point in time the association is an issue committee.

Not only does this interpretation comport with accepted principles of statutory interpretation, it furthers what the people obviously intended in adopting the FCPA, an election reform act. Under the majority's interpretation, all an organization need do to evade the reach of the FCPA is organize an association for a stated purpose other than opposing or supporting ballot questions, regardless of its actual conduct. I cannot conclude that this was the electorate's intent. The statute itself declares that "the interests of the public are best served by ... full and timely disclosure of campaign contributions." [4] § 1–45–102. At least with respect to "issue committees," the majority's holding will largely prevent the FCPA from achieving that goal.

### IV. Legislative History of Prior Statute Should Not Apply to the Initiative

Understandably, the majority must look elsewhere to find support for its narrow construction of the definition of issue committee. Rather than look to the intent of the electorate, the majority must reach into the legislative history of the General Assembly's Campaign Reform Act (CRA), which the citizen-initiated FCPA replaced. I find that the majority's reliance is analytically flawed and particularly unfortunate for at least two reasons. First, the citizen initiative was adopted to repudiate the actions of the very legislation the majority now relies upon.

Second, the FCPA is not an amendment to the CRA. Rather, the FCPA is the result of a citizen initiative entirely replacing the General Assembly's CRA. Although the citizen-drafters borrowed some of the General Assembly's language, I would not, under these circumstances, assume that the intent of a prior General Assembly then could rightly be treated as "legislative history" for this citizen-initiated statute.

4. Because it included issue committees in its list of associations that must register and report contributions and expenditures, we presume that the

### A.

Simply stated, in dealing with a legislative enactment, we would not treat a law passed by a subsequent General Assembly in this fashion, burdening it with the intent of a different General Assembly. *Cf. United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 348–49, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963) (refusing to infer the intent of an earlier legislature from the views of a subsequent one). Yet, the majority here encumbers this independent citizen initiative with the objectives of a prior General Assembly, one that led the citizens to use the initiative process because they were not satisfied with existing legislation. In my view, the statute should thus be interpreted as a separate act, not an amendment of the General Assembly's legislation.

In any event, I do not agree with the majority that the legislative history of the CRA—assuming its relevance—compels the majority's conclusion. The CRA, adopted by the General Assembly in 1974, did not use the term "issue committee." *See* §§ 1–45–101 to –121, 1 C.R.S. (1975 Supp.). That concept instead was encompassed in the CRA's definition of "political committee": " 'Political committee' means any two or more persons who ... have associated themselves or cooperated for the purpose of accepting contributions ... or making expenditures to support or oppose a candidate for public office at any election or seek to influence the passage or defeat of any issue." § 1–45–103(10), 1 C.R.S (1975 Supp.). Such associations under the CRA explicitly included those "formed principally for some other purpose insofar as [they] make[ ] contributions or contributions in kind or expenditures." *Id.*

The majority concludes from the absence of this phrase and of the term "cooperated" in the current statutory definition of issue committee that the electorate intended to exclude organizations formed for other reasons from the reach of the FCPA. Again I disagree.

electorate intended to include in its declaration of purpose issue campaigns as well as candidate campaigns.

Even assuming that the electorate deliberately failed to include the term "cooperated" and the phrase concerning organizations formed principally for some other purpose from the act that it repealed, there is no evidence that the electorate intended to create the giant loophole in the statute that the majority creates today. The plain and ordinary definition of "associated" includes two or more persons who "cooperate" with one another for a specific purpose. *See supra* Part III. The electorate thus did nothing more than correct a redundancy by eliminating the word "cooperated" from the FCPA.

### B.

More to the point, the drafters of the FCPA were likely eager to avoid the confusion created by the phrase "formed principally for some other purpose," which the General Assembly included in the CRA. Interpreting that phrase in the CRA, this court held that ordinary, for-profit corporations contributing to political campaigns were "political committees" under the Act. *See Colorado Common Cause*, 758 P.2d at 163. Shortly thereafter, the General Assembly amended the statute to preclude such an interpretation. In doing so, the General Assembly excluded from the definition of "political committee" any "association, corporation, ... or other organization or group solely making contributions or contributions in kind to support or oppose a candidate for public office or to influence the passage or defeat of any issue." Ch. 32, sec. 1, § 1–45–103, 1988 Colo. Sess. Laws 299. Even after this amendment, organizations formed principally for some other purpose were still subject to the CRA's disclosure requirements to the extent that they *collected* money to be distributed to political campaigns. *See id.* (excluding from the CRA's reach any organization "*solely making contributions* or contributions in kind to support or oppose a candidate for public office or to influence the passage or defeat of any issue" (emphasis added)).

The amendment to the CRA was necessary because that Act, as opposed to the FCPA, subjected an association to its registration and reporting requirements when the association accepted contributions *or* made expenditures in support of a candidate or issue. *See* § 1–45–103(10), 1 C.R.S. (1975 Supp.) (" 'Political committee' means any two or more persons who are elected, appointed, or chosen or who have associated themselves ... for the purpose of accepting contributions ... or making expenditures...."). As a result, no association, regardless of its principal purpose, could contribute to a campaign without first registering as an issue committee.

The FCPA avoids that result by simply using the word "and" instead of "or." Under the FCPA, an association becomes an issue committee only if it accepts contributions *and* makes expenditures in support of or opposition to a ballot issue: " 'Issue committee' means two or more persons who are elected, appointed, or chosen, or have associated themselves for the purpose of accepting contributions *and* making expenditures to support or oppose any ballot issue or ballot question." § 1–45–103(8), 1 C.R.S. (1999) (emphasis added). Thus, an organization like the Adolph Coors Company—which *Colorado Common Cause* held was a political committee under the CRA, since it made expenditures in support of a ballot issue—does not become an issue committee unless it becomes a conduit for others' contributions by accepting contributions and spending those funds for or against a ballot issue. Having solved the problem of exempting ordinary corporations from the FCPA's registration and reporting requirements in this manner, the citizen-drafters may very well have omitted further language defining issue committee because they believed that it was unnecessary and unwise to include language that could be misinterpreted to include ordinary corporations.

### V. Fair Campaign Practices Act and the Questions Certified

Hence, based on the plain language of the statute and the People's declared intent in adopting that statute, I would answer the federal district court's first certified question in the affirmative. Although CS Alliance was formed in 1996 for purposes other than accepting contributions and making expendi-

tures to support or oppose a ballot issue, it later became an issue committee with respect to the Entrance to Aspen ballot issues. It is undisputed that on July 20, 1998, CS Alliance was primarily engaged in accepting contributions and making expenditures to oppose or support a ballot issue, or that two or more of its members "associated themselves[ ] for the purpose of accepting contributions and making expenditures to support or oppose [a] ballot issue or ballot question." § 1–45–103(8). By submitting its proposed ballot question to the secretary of state, CS Alliance manifested its intent to support its ballot question with contributions from the public. Indeed, the ALJ found that at that point CS Alliance had already begun to accept contributions and to make expenditures in support of its position on the Entrance to Aspen ballot issues. It was therefore incumbent upon CS Alliance to register with the secretary of state as an issue committee.

However, since it is the act of accepting contributions and making expenditures to oppose or support a ballot issue or question that subjects an issue committee to the disclosure requirements of the FCPA, I would hold that only those contributions accepted and expenditures made to oppose or support a ballot issue or question must be reported. Therefore, under my construction of the FCPA, CS Alliance need not disclose all of its contributions or contributors, nor all of its expenditures. Under this interpretation, which is consistent with the objects and purposes of the almost one million electors voting for reform, an issue committee need disclose only those contributions accepted and expenditures made in support of or opposition to the ballot issue or issues that subject it to the FCPA's registration and reporting requirements.

Therefore, I would answer the second certified question by holding that an organization becomes an issue committee when two or more persons have "associated" to support or oppose a ballot issue.

I would further hold, in answering the third certified question, that such organizations need only report those contributions accepted and expenses made in support of or opposition to the relevant ballot issue. In

my view, such an interpretation and construction would not necessitate, in this context, that we interpret the statute "broadly," maj. op. at 749. These answers, I believe, best interpret the FCPA based on its language and, most importantly, defer to the unquestioned and modest intent of the electorate.

## VI. Conclusion

Accordingly, and for the reasons set forth above, I respectfully dissent.

I am authorized to say that Justice MARTINEZ joins in this dissent.