In re THE 2000–2001 DISTRICT GRAND JURY in and for the FIRST JUDICIAL DISTRICT, STATE OF COLORADO and CONCERNING the GRAND JURY REPORT ON the PROLAND ANNEXATION.

No. 00SA315.

Supreme Court of Colorado, En Banc.

April 16, 2001.

As Modified on Denial of Rehearing May 14, 2001.

Jean E. Dubofsky, P.C., Jean E. Dubofsky, Boulder, CO, Linda Creagan, Denver, CO, Attorneys for Petitioner.

David J. Thomas, District Attorney, Dennis Hall, Senior Deputy District Attorney, Golden, CO, Attorneys for Respondent.

Ken Salazar, Attorney General, Roger G. Billotte, Assistant Attorney General, Appellate Division, Criminal Justice Section, Denver, CO, Peter A. Weir, Executive Director, Colorado District Attorney's Council, Denver, CO, Attorneys for Amici Curiae the Colorado Attorney General and the Colorado District Attorney's Council.

Haddon, Morgan & Foreman, P.C., Lee D. Foreman, Rachel A. Bellis, Denver, CO, Attorneys for Interested Party.

Dill Dill Carr Stonbraker & Hutchings, P.C., Robert A. Dill, Patrick D. Tooley, Denver, CO, Attorneys for Interested Party.

Justice KOURLIS delivered the Opinion of the Court.

In this original proceeding we consider the role of the courts in ascertaining whether a grand jury may release a report of its findings even when it declines to issue an indictment in accordance with section 16–5–205.5, 6 C.R.S. (2000).

The District Grand Jury in and for the First Judicial District investigated official conduct of the City of Black Hawk that successfully blocked a hotly contested land annexation plan by Central City. The investigating grand jury declined to issue an indictment against either the City of Black Hawk or certain city officials, but wished to file a report detailing its findings because the grand jury determined that "preparation and release of a report would be in the public interest" pursuant to section 16–5–205.5. On September 22, 2000, the trial court found that the district attorney and the grand jury had satisfied the statutory requirements for public dissemination of a report and ordered the issuance of the report together with any responses furnished by protesting parties in accordance with the statute.

Shortly thereafter, on September 28, 2000, the trial court granted a brief stay allowing any party to request relief from the order by means of an original proceeding in this court. Petitioners[1] filed a Rule 21 motion request-

ing this court to issue a rule to suppress or expunge the grand jury report. Petitioners claim that because the district attorney knew that the City of Black Hawk and its officials violated no criminal laws, the district attorney acted beyond the scope of his authority by presenting the matter to the grand jury. They therefore further argue that the grand jury was without authority even to investigate, let alone to issue a report.

We conclude otherwise. A citizen made allegations of misconduct, which allegations the district attorney then submitted to the grand jury. When it chose not to issue an indictment, the grand jury had the discretion to seek to release a report under the Grand Jury Reports statute. The grand jury and the district attorney certified to the court that the report concerned matters of public interest, as defined by the statute. The trial court had an obligation to verify that the report comports with the certification. Accordingly, the trial court here did not err in permitting the release of the report.

## I.

Central City and the City of Black Hawk are cities in which limited stakes gaming facilities are authorized by sections 12–47.1–104 to –105, 4 C.R.S. (2000). Central City lies one mile off Colorado State Highway 119 in Gilpin County and visitors to Central City generally first pass through the City of Black Hawk. Central City believes that potential gamers are diverted to Black Hawk for their gaming because it is the first casino-rich environment they reach when driving from the Denver metro area. To redress its perceived financial losses, Central City sought to build an access road from Interstate 70 (the Southern Access Road), thereby allowing travelers to arrive directly in Central City from the Denver metro area.

Proland Management, Inc., owned substantial lands south and west of Central City and sought to annex this property to Central City in order to utilize the City's municipal services. In exchange for annexation, Proland

---

1. Because the original proceeding was filed under seal, we do not identify Petitioners herein and make only general references to the record.

Management agreed to finance the portion of the Southern Access Road crossing its development.

Annexation by municipalities in Colorado is governed by statute and the Colorado Constitution. Annexation may be completed by election or petition. This case deals with an attempted annexation by petition. The statute and constitution set forth two requirements for annexation by petition. First, the owners of more than fifty percent of the land area must sign the annexation petition. § 31-12-107(1)(c)(III), 9 C.R.S. (2000). Second, "persons comprising more than fifty percent of the landowners in the area" must sign the annexation petition. Colo. Const. art. II, § 30. Proland Management obtained enough signatures of landowners in the proposed area of annexation to meet the statutory and constitutional requirements for annexation by petition and set a hearing date for its petition before the city council meeting of Central City on November 17, 1998.

On November 12, 1998, the City of Black Hawk purchased mining claims located in the proposed area of annexation for $50,000. The money came from public funds of the City of Black Hawk with City approval. The City of Black Hawk then conveyed undivided one percent interests in the land to thirteen entities or individuals in exchange for $500 each, thereby creating some 45 additional landowners. These conveyances, and attendant new landowners, destroyed the adequacy of Proland Management's annexation petition, because the new conveyances meant that fewer than fifty percent of the landowners in the area signed the petition for annexation as required by the Colorado Constitution. After the pool of signing landowners changed, Proland Management abandoned its annexation petition and rescinded its offer to construct a portion of the Southern Access Road.

In the spring of 2000, a citizen filed a complaint against officials of the City of Black Hawk alleging violations of the election code. The district attorney submitted the citizen complaint to the grand jury for review. The grand jury investigated the matter and declined to issue an indictment but prepared and sought to issue a public report in accordance with section 16–5–205.5. Pursuant to the statute, the district attorney submitted the grand jury report and responses to the trial court. *See* § 16–5–205.5(4).

Petitioners asked the trial court to expunge and suppress the report because the grand jury lacked proper authority for its initial inquiry and subsequent actions.[2] The trial court denied the motion and found the grand jury probe properly began with an inquiry into suspected criminal activity. The trial court ultimately approved the release of the grand jury report.

## II.

We begin with an overview of the function of the grand jury in Colorado. The grand jury has broad power as an investigative and accusatory body to "ferret out criminal activity." *Gher v. Dist. Court*, 183 Colo. 316, 319, 516 P.2d 643, 644 (1973). "A grand jury is accountable to no one and should not be used as a super-legislative body or to express views on political issues." *In the Matter of the 1976 Arapahoe County Statutory Grand Jury*, 194 Colo. 308, 310, 572 P.2d 147, 148 (1977). Only section 16–5–204, 6 C.R.S. (2000), addresses the statutory scope of the grand jury's power. According to the statute, the grand jury has a "duty to inquire into offenses against the criminal laws of the state of Colorado alleged to have been committed." § 16–5–204(3)(a).

In Colorado, a district attorney has wide prosecutorial discretion and may bring charges either by filing a complaint or direct information or by presenting a grand jury indictment in open court. Crim.P. 7(a); *Dresner v. County Court*, 189 Colo. 374, 375, 540 P.2d 1085, 1086 (1975). A prosecutor may seek a grand jury indictment even after a county court dismisses a criminal charge for lack of probable cause in a preliminary hearing. *People v. Noline*, 917 P.2d 1256,

---

2. The trial court noted in its Order of September 22, 2000, that "numerous parties filed motions asking this court to take a variety of actions." We only reach the grand jury's authority to issue a report and the appropriate role of the trial court regarding the public dissemination of that report, and do not address any other orders that were not contested before this court.

1267 (Colo.1996). However, "[o]ur criminal justice system in Colorado is not geared to the use of the grand jury in every criminal case. The district attorney should utilize the information as the charging document in the ordinary case." *Losavio v. Kikel,* 187 Colo. 148, 152, 529 P.2d 306, 308 (1974).

■ However, in cases alleging political corruption, the grand jury provides a "necessary and worthwhile service." *Id.* at 151, 529 P.2d at 308. "Where corruption is charged, it is desirable to have someone outside of the administration act, so that the image, as well as the fact, of impartiality in the investigation can be preserved and allegations of cover-up or white-wash can be avoided." *Id.* On the other hand, we have emphasized in the past and do so again that the grand jury should not be used for political or other improper purposes "and should not be utilized as a handmaiden to the district attorney." *Id.* at 151–52, 529 P.2d at 308.

■ Investigating alleged corruption by governmental officials, such as those alleged against the City of Black Hawk and its officials, falls squarely within the scope of the grand jury's power both under our caselaw and under the terms of the applicable statute.[3]

### III.

■ We next examine for the first time the provisions of the Grand Jury Reports statute as amended in 1997. Preliminarily, as in the review of any statute, we must look to the plain language. *People v. J.J.H.,* 17 P.3d 159, 162 (Colo.2001). An appellate court interpreting statutory provisions must attempt to effectuate the intent of the legislature and the plain language of the statute is the best indication of legislative intent. *Id.*

The Colorado Constitution expressly delegates the power to regulate the grand jury to the general assembly. *See* Colo. Const. art

2, § 23 (stating "the general assembly may change, regulate or abolish the grand jury system"); *de'Sha v. Reed,* 194 Colo. 367, 371, 572 P.2d 821, 823 (1977). The General Assembly added section 16–5–205.5 in 1997. It reads in pertinent part:

> (1) In any case in which a grand jury does not return an indictment, the grand jury may prepare or ask to be prepared a report of its findings if the grand jury determines that preparation and release of a report would be in the public interest, as described in subsection (5) of this section. The determination to prepare and release a report pursuant to this section must be made by an affirmative vote of at least the number of jurors that would have been required to return an indictment. The report shall be accompanied by certification that the grand jury has determined that release of the report is in the public interest, as described in subsection (5) of this section.
>
> . . . .
>
> (5) Release of a grand jury report pursuant to this section may be deemed to be in the public interest only if the report addresses one or more of the following:
>
> (a) Allegations of the misuse or misapplication of public funds;
>
> (b) Allegations of abuse of authority by a public servant, as defined in section 18–1–901(3)(*o*), C.R.S., or a peace officer, as defined in section 18–1–901(3)(*l*), C.R.S.;
>
> (c) Allegations of misfeasance or malfeasance with regard to a governmental function, as defined in section 18–1–901(3)(j), C.R.S.;
>
> (d) Allegations of commission of a class 1, class 2, or class 3 felony.

§§ 16–5–205.5(1), (5). The statute has a number of procedural safeguards protecting

---

**3.** During the legislative hearing regarding the bill, David J. Thomas, the District Attorney for the First Judicial District, told the House Judiciary Committee that he supported the bill stating: "We have a number of cases which we take to the grand jury because we receive complaints from … the public … and many of these really fall into the area of governmental operations,

very honestly. And we take them to the grand jury because we feel ethically bound to do so." A Bill for an Act Concerning Release of Grand Jury Reports in Which No Indictment is Returned: Hearing on HB 97–1009 Before House Judiciary Comm., 61st General Assembly, 1st Sess. (Jan. 21, 1997).

against careless issuance of reports.[4]

Specifically, a grand jury report may only issue if at least the same number of jurors required to return an indictment agree to file the report. § 16–5–205.5(1). Further, both the foreperson and the prosecuting attorney must certify that the grand jury has determined that the release of the report is in the public interest in accordance with the statute. § 16–5–205.5(4)(b). Within ten days of receiving the report, the prosecuting attorney must notify the parties named in the report so they may review it and submit a response. § 16–5–205.5(3). After the time for submission of responses, the prosecutor then submits the report to the court. § 16–5–205.5(4). The court must examine the report and make an order accepting and filing the report if the court is satisfied that the grand jury followed statutory procedures. *Id.*

The trial court's role in reviewing the grand jury proceedings is limited. First, the court must be satisfied that the grand jury and the prosecutor acted within the statutory jurisdiction of such persons in convening the grand jury. § 16–5–205.5(4)(a). Second, the grand jury and prosecuting attorney must verify to the court that the report is in the public interest as defined by statute, and that the report is based on facts revealed in the record that are supported by a preponderance of the evidence. § 16–5–205.5(4)(b)(II). Third, the report may not contain material the sole purpose of which is to ridicule or abuse a person or to subject them to public disgrace or embarrassment. § 16–5–205.5(4)(b)(III). The report may not contain personal information not relating to a lawful inquiry. § 16–5–205.5(4)(b)(IV). A grand jury report is in the public interest only if it addresses one or more of the following: allegations of the misuse or misapplication of public funds; allegations of abuse of authority by a public servant or a peace officer; allegations of misfeasance or malfeasance with regard to a governmental function; or allegations of commission of a class 1, 2, or 3 felony. § 16–5–205.5(5). Should the grand jury and district attorney meet these statutory requirements to the court's satisfaction, then the court accepts and files the report. § 16–5–205.5(4). At that point, the report becomes public. The statute does not authorize the court to inquire into the underlying facts that comprise the report, except to the extent that the court must determine that the certifications of the grand jury foreperson and prosecuting attorney are borne out by the report: specifically, that the report contains matters of public interest within the narrow definition of the statute.

The statute's legislative history evidences the General Assembly's intent that the court have limited discretion in determining whether the report should be released, and such intent is manifest in the language of the statute. Hence, we need not examine the legislative history of the statute. We do so, however, for the purpose of demonstrating the clear application of the legislative intent to the case at hand. The first version of the House Bill allowed the trial court to expunge any portion of the record not supported by a preponderance of the evidence. This version would have caused the trial court to substitute its judgment for that of the grand jury by reexamining the evidence presented to the grand jury. Ultimately, the sponsors of the bill changed it substantially to allow the court to review only the report drafted by the grand jury (not the record of the proceedings), the certifications from the foreperson and the prosecuting attorney, and parties' responses.[5] The revised bill, which

---

4. In fact, at the hearing before the Senate Judiciary Committee, Senator Ed Perlmutter, the sponsor of the bill, stated "we don't want to have grand jury reports issued willy-nilly where there has not been an indictment. [T]he purpose of this bill is to lay out the parameters in the process for when a report might be issued by the grand jury, and what I will start with is the report would have to be one in the public interest." A Bill for an Act Concerning Release of Grand Jury Reports in Which No Indictment is Returned: Hearing on HB 97–1009 Before Sen-

ate Judiciary Comm., 61st General Assembly, 1st Sess. (Feb. 18, 1997).

5. "The judiciary was mostly concerned with the initial ... the way the bill was initially drafted, that they were just sort of thrown too much, and they only wanted to be the third backstop and that was it." A Bill for an Act Concerning Release of Grand Jury Reports in Which No Indictment is Returned: Hearing on HB 97–1009 before Senate Judiciary Comm., 61st General Assembly, 1st Sess. (Feb. 18, 1997) (statement of Senator Ed Perlmutter).

was finally enacted, set forth limited circumstances in which the court may refuse publication, and no discretion to redact.

Proponents of the bill claimed that "public interest" meant that the public had a right to know about "government actions that fall short of criminal activity, but are nonetheless not good government." A Bill for an Act Concerning Release of Grand Jury Reports in Which No Indictment is Returned: Hearing on HB 97–1009 before Senate Judiciary Comm., 61st General Assembly, 1st Sess. (Jan 21, 1997) (statement of Bill Ritter, Jr., District Attorney for Second Judicial District).[6] The proponents further observed that total secrecy of the grand jury proceedings should not take precedence over the public benefit associated with awareness of governmental misconduct even though not of criminal proportions.[7] Legislators and supporters of the bill emphasized that the new statute provided adequate safeguards to ensure that only reports containing information clearly in the public interest would be subject to release. In fact, the Senate sponsor of the bill specifically informed the Senate Judiciary Committee that grand jury reports were not to be abused by District Attorneys to satisfy "a political vendetta." A Bill for an Act Concerning Release of Grand Jury Reports in Which No Indictment is Returned: Hearing on HB 97–1009 Before Senate Judiciary Comm., 61st General Assembly, 1st Sess. (Feb. 18, 1997) (statement of Senator Ed Perlmutter).

Further evidence of the limited role of the trial court in allowing the release of a grand jury report is evidenced by a comparison of section 16–5–205(4), 6 C.R.S. (1986), and section 16–5–205.5 that replaced it. Section 16–5–205(4) addressed the grand jury reports and provided:

> The court to which a grand jury report is made in which no "true bill" is found shall examine such report and make an order accepting and filing such report as a public record only if the court is satisfied that the grand jury and the district attorney or attorney general were acting within the statutory jurisdiction of such persons in convening such grand jury and that the court is satisfied of the following:
>
> (a) That the report is based upon facts revealed in the course of a grand jury investigation and is supported by a preponderance of the evidence; and
>
> (b) That the report does not contain material the sole effect of which is to ridicule or abuse a person or to subject such person to public disgrace or embarrassment; and
>
> (c) That the report does not contain material which is personal in nature that does not relate to any lawful inquiry; and
>
> (d) That the report does not accuse a named or unnamed person directly or by innuendo, imputation, or otherwise of any act that, if true, constitutes an indictable offense unless the report is accompanied by a presentment or an indictment of the person for the offense mentioned in the report; and
>
> (e) That no confidentiality agreement will be violated and the identity of no confidential informant will be disclosed in making such grand jury report public; and

---

6. Representative Bill Kaufman, one of the sponsors of the bill, gave the House Judiciary Committee an example of when a grand jury might issue a report. He hypothesized that a grand jury might be convened to investigate allegations of criminal violations stemming from construction at Denver International Airport and the grand jury might discover no criminal conduct but find massive waste of resources by city contractors. Representative Kaufman claimed that the taxpayers supporting the airport construction would have the right to know about this type of governmental mismanagement, and issuance of a grand jury report would serve the public interest. A Bill for an Act Concerning Release of Grand Jury Reports in Which No Indictment is Returned: Hearing on HB 97–1009 Before House Judiciary Comm., 61st General Assembly, 1st Sess. (Jan. 21, 1997).

7. In legislative hearings, Bill Ritter stated "[r]eally I think the greater concern the District Attorneys have when we brought this bill to Representative Kaufman is that the secrecy provision of the grand jury should not always be such that the public is kept in the blind." A Bill for an Act Concerning Release of Grand Jury Reports in Which No Indictment is Returned: Hearing on HB 97–1009 before Senate Judiciary Comm., 61st General Assembly, 1st Sess. (Feb. 18, 1997).

(f) That the court finds that the filing of such report as a public record does not prejudice the fair consideration of a criminal matter.

The repealed statute called for the trial court to make findings of fact to conclude that information in the grand jury's report was supported by a preponderance of the evidence. The 1997 Grand Jury Reports statute significantly narrows the trial court's role in reviewing grand jury proceedings. First, section 16–5–205.5 removes any inquiry into sufficiency of the evidence from the trial court. Second, section 16–5–205.5 only requires that the trial court be satisfied that the report complied with the provisions of the statute.

■ In summary, the plain language of the statute, the legislative history and the contrast between the new provisions and the old direct us to the conclusion that the General Assembly intended a limited role for the trial courts in determining whether a grand jury report is to be released or not. We now state that the role of the trial court is to review the report independently to determine whether, on its face, the report satisfies the requirement that it concern matters of public interest, as defined in the statute. By that review, the trial court is measuring the certification of the grand jury foreperson and the prosecuting attorney against the facts contained in the report.

### IV.

In this case, Petitioners assert that the district attorney submitted for grand jury review a patently false allegation of criminal misconduct and question the district attorney's motivation. Specifically, Petitioners claim that because the Proland annexation took place by petition and not election, no Black Hawk official could have possibly violated elections laws and therefore the matter was neither of criminal proportion nor properly before the grand jury. Moreover, Petitioners urge that prior precedent in Colorado prohibits the grand jury from investigating the procedures utilized by Black Hawk to stymie the proposed annexation of land to Central City, because Black Hawk's actions were civil in nature, politically motivated, and violated no criminal statutes. Petitioners cite *Gher v. District Court* as support. 183 Colo. 316, 516 P.2d 643 (1973).

In *Gher*, this court found that no authority exists to permit a grand jury to extend its "investigatory jurisdiction into a civil or political annexation dispute by the hollow assertion that the inquiry has criminal overtones." *Id.* at 318, 516 P.2d at 644. In *Gher*, the court quashed a grand jury subpoena because it found that the district attorney improperly sought to develop facts in the grand jury setting regarding an annexation dispute. The court there found that the annexation did not involve "any possible violation of criminal laws" and was an inappropriate topic for grand jury review. *Id.*

The trial court agreed and distinguished *Gher* by noting that in *Gher* no possible violation of criminal laws existed for that grand jury to investigate. The district attorney in this case submitted to the grand jury a citizen's complaint alleging criminal violations of the election code. Although the grand jury failed to return an indictment, the present case cannot, therefore, be properly characterized as merely a civil or political annexation dispute. We agree with the trial court that *Gher* does not apply.

■ In our review, we limit ourselves to the report and attachments, just as the trial court limits its review similarly. We do not inquire behind the report or rely in any way upon sealed pleadings. Rather, such limited review—both here and in the trial court—supports the trial court's finding that this grand jury report may be released.[8]

### V.

We find that the grand jury, the district attorney, and the trial court complied with

---

8. The trial judge stated in his September 22, 2000, Order: "I initially note the limited function I am to serve under the statute. It is not my job to weigh the evidence, try the case, or perform any function other than accepting the report, finding that the statute has been complied with, and if so releasing the report to the public." The judge relied on the plain language of the statute and its legislative history.

the provisions of section 16–5–205.5. We find that both the plain language and the legislative history of section 16–5–205.5 allow the release of grand jury reports in precisely this situation. The allegations that the report addresses concern matters that are within the statutory definition of "public interest." The statute's language protects the secrecy and sanctity of grand jury proceedings and provides adequate safeguards for parties implicated in a grand jury report to respond. The court has a limited role in its review of grand jury reports, and we decline to expand it beyond what the General Assembly clearly intended. Accordingly, we discharge the rule to show cause and remand the case to the trial court for consideration of any other pending matters before release of the report.

Justice MARTINEZ dissents.

Justice BENDER does not participate.

Justice MARTINEZ dissenting:

The majority distinguishes the case before us today from *Gher v. District Court*, 183 Colo. 316, 516 P.2d 643 (1973), which I believe is controlling. In *Gher*, we held that a grand jury is not authorized by statute "to extend its investigating jurisdiction into a civil or political annexation dispute by the hollow assertion that the inquiry has criminal overtones." *Gher*, 183 Colo. at 318, 516 P.2d at 644. The majority attempts to distinguish *Gher* as involving no possible violation of criminal law to investigate, noting that in the case before us today, a complaint, which alleged criminal violations of the election code, initiated the investigation. However, creating new property owners who are eligible to sign a petition for annexation, as was done in this case, does not violate the election code. Therefore, in the case before us, as in *Gher*, there was no possible violation of criminal law to investigate. Thus, the assertion that there were allegations of criminal violations of the election code or of political corruption is, in my view, a "hollow assertion that the inquiry has criminal overtones." I conclude that the grand jury improperly extended its jurisdiction into a civil or political annexation dispute, as did the grand jury in *Gher*. Accordingly, I respectfully dissent.

The majority primarily focuses on the trial court's limited role in reviewing grand jury reports and the public interest requirement of the grand jury report statute. Maj. op. at 926–927. The majority concludes that the grand jury, the district attorney, and the trial court complied with the provisions of section 16–5–205.5, 6 C.R.S. (2000). After attempting to distinguish *Gher*, the majority approves the trial court order authorizing the release of the grand jury report.

In my view, the relevant issue in this case is the validity of the underlying grand jury investigation. I agree with the majority that the trial court's role in determining whether a grand jury report should be released is limited. However, I believe that the grand jury acted in excess of its statutory authority in considering allegations of violations of the election code in this case. The allegation that the election code was violated by creating additional eligible electors was premised on a misunderstanding of the applicable law. It is immaterial whether these allegations are referred to as allegations of political corruption or of violations of the election code. Creating new electors in annexation proceedings through the transfer of interests in mining claims to new owners is not unlawful.[1]

During this hotly contested and very political public land annexation dispute between Central City and the City of Blackhawk (Blackhawk), Central City sought to annex land immediately south of Blackhawk along Colorado State Highway 119.[2] Blackhawk and its officials viewed the area of the proposed annexation as critical to the city's tax base and the financial well-being of casinos located in Blackhawk and sought to block the annexation. Accordingly, Blackhawk, acting

---

1. Although I explain in this opinion that the tactic employed here to dilute the pool of persons eligible to sign the annexation petition is not unlawful, I express no opinion about whether it should be unlawful. The legality of this tactic was a legislative decision that can only be changed by the general assembly.

2. Like the majority, I discuss the facts from the sealed record only to the extent necessary to explain my opinion.

through its city council, purchased property known as the Louella Thomas mining claims and sold fractional interests in the property to third parties who opposed Central City's annexation of the area. Blackhawk successfully created enough additional property owners in the proposed annexation area to defeat the statutory requirement that more than fifty percent of the landowners agree to the annexation by signing the petition for annexation.[3] Blackhawk's response to the proposed annexation led to requests by Central City officials for a grand jury investigation. Subsequently, the grand jury decided not to issue an indictment, but sought to issue a grand jury report concerning the matter pursuant to section 16–5–205.5.

The political motivation behind the grand jury investigation is demonstrated by a letter supporting an investigation sent to the District Attorney for the First Judicial District from a Central City official. The relevant portions of the letter state:

> Blackhawk's efforts cost the City of Central, its taxpayers, and its business community untold millions of dollars. Specifically, because of the blocking of the annexation, Central City lost the enormous potential inherent in beginning the Southern Access road with private financing, delaying the road for at least two years and dramatically increasing our expenses for land acquisition, legal fees, and ultimately, the costs of the construction of the road.... I believe that the closure of five casinos and at least three small businesses are the result of the delay and uncertainty created by Blackhawk['s] relentless work to kill the Southern Access road and the attendant prospects and potential for development.

These allegations dealt specifically with the economic repercussions of political differences.

The majority opinion notes that a citizen complaint to the district attorney of the First Judicial District in March 2000 triggered the grand jury investigation. Maj. op. at 924. However, this complaint was filed by a Central City councilmember following Central City's defeat in the hotly contested annexation dispute. The councilmember's affidavit alleged that Blackhawk's purchase and subsequent resale of the Louella Thomas mining claims violated section 1–13–202, 1 C.R.S. (2000). The affidavit stated "the only purpose of the ... grantors in placing title to the ... properties in the grantees was to qualify each grantee as a tax paying elector under title 31, the Annexation Act." The councilmember claimed that Blackhawk's transfer of interests in certain mining claims "created 45 additional landowners who became entitled to vote under Section 31–12–112(2), C.R.S., in the then pending annexation election."

Before the petitioner and other witnesses were subpoenaed to testify before the grand jury, Blackhawk's attorneys provided the district attorney with extensive information conclusively demonstrating that no possible criminal violation of election law was committed by the creation of new property owners. Both the trial court and the majority have refused to consider this information, which includes the Petition for Annexation, Central City Council Resolution No. 39–98, Central City Ordinance No. 98–21, and several affidavits and letters, including the complaints that launched the investigation and letters from Blackhawk's attorneys explaining that the tactics employed were lawful.

The district attorney acknowledges he realized that these annexation proceedings are not governed by the provisions of Title 1, C.R.S., and that section 1–13–202, which was allegedly violated, is not applicable. Instead, he submitted the matter to the grand jury for review on the basis that counterparts to the statute cited in the councilmember's affidavit are found in the Municipal Election Code. Thus, he maintains that the councilmember intended to allege a criminal violation of section 31–10–1536, 9 C.R.S. (2000).

Section 31–10–1536 prohibits changing the title of property to attempt to qualify another

---

**3.** § 31–12–107(1), 9 C.R.S. (2000), provides that landowners of more than fifty percent of the area proposed to be annexed must sign the petition for annexation.

person as a "qualified tax paying elector."[4] A "qualified tax paying elector" is "a *qualified elector* who, during the twelve months next preceding the election, has paid an ad valorem tax on property owned by him and situated within the *municipality* or within the territory involved in the proposed *incorporation* or *improvement district*." § 31–1–101(8), 9 C.R.S. (2000)(emphasis added). The property at issue here is not in a municipality, a proposed area of incorporation, or a proposed special district. Rather, it is land sought to be annexed in unincorporated Gilpin County. Therefore, none of the newly created property owners could have become a "qualified tax paying elector."

Furthermore, under the Municipal Annexation Act of 1965, only registered electors who are resident landowners in the proposed area of annexation are "qualified electors." *See* § 31–12–103(9), 9 C.R.S. (2000). A resident is a person who makes his primary dwelling place within the proposed area of annexation. § 31–12–103(11). The property purchased and resold by Blackhawk involved interests in mining claims, not residential property. Thus, none of the new property owners could become qualified electors as a result of their purchase of the mining claims. Because the new property owners did not become "qualified electors" as a result of their purchase of the mining claims, they could not become "qualified tax paying electors" by purchasing the property.

Thus, there are two independent reasons that creating these new property owners was not unlawful. Although the new property owners did not become "qualified tax paying electors," they did become entitled to sign the petition for annexation because property owners do not need to be qualified electors to sign the petition for annexation or to vote in an annexation election. *See* § 31–12–107(1) (landowners of more than fifty percent of the proposed area of annexation may petition for annexation); § 31–12–112(2) ("Any landowner owning land in the area proposed to be annexed may vote, irrespective of whether he is a qualified elector."). Consequently, Blackhawk and its officials could not have possibly violated the prohibition against creating qualified taxpaying electors through its purchase and resale of the mining claims because the prohibition is inapplicable to both annexation proceedings and mining claims.

Furthermore, the methods used by Blackhawk to block the proposed annexation have previously been used in such situations precisely because they are not unlawful.[5] In fact, the grand jury report itself concluded that although several statutes prohibit the creation of voters for the purpose of influencing the outcome of some elections, the statutes fail to address the creation of petitioners or voters in annexation proceedings.

Without possible violations of criminal activity, the grand jury lacked authority to investigate the lawful tactic employed in this annexation dispute. The role of grand juries has historically been limited to the investigation of criminal offenses. *Gher* expressed this view, holding that in the absence of specific legislation to the contrary, the pur-

---

4. Section 31–10–1536 provides:
   It is unlawful to take or place title to property in the name of another, or to pay the taxes, or to take or issue a tax receipt in the name of another for the purpose of attempting to qualify such person as a "qualified taxpaying elector", or to aid or assist any person to do so. The ballot of any such person violating this section shall be void.... A "qualified taxpaying elector" means a qualified elector who, during the twelve months preceding the election, has paid an ad valorem property tax on property owned by him and situated with the municipality or who, with respect to a proposed city or town or the creation of an improvement district, is qualified to register to vote in the territory involved in the proposed incorporation or district.

5. Although I have found no appellate decision addressing the creation of new property owners to defeat a proposed annexation by petition, partial transcripts submitted both to the district attorney and to the court demonstrate the use of this tactic and that trial courts have found such practices to be lawful. Examples include: *In Re the Matter of: Beebe Draw Water and Sanitation District*, Case No. 85CV806 (Adams Cty. Dist. Ct.1998), and *City of Northglenn v. City of Thornton*, Case No. 90CV597 (Weld Cty. Dist. Ct.1991) at 10–13. *See* Attachments to Rule to Show Cause. In addition, an attorney experienced with annexation disputes signed an affidavit stating that the tactics used by Blackhawk to defeat the proposed annexation by petition are commonly used in such disputes. *Id.*

pose of a grand jury is to investigate possible criminal offenses. *Gher,* 183 Colo. at 319, 516 P.2d at 645; *People v. Maestas,* 199 Colo. 143, 146, 606 P.2d 849, 851 (1980); *People v. Ager,* 928 P.2d 784, 788 (Colo.App.1996). The reporting statute does not provide the specific statutory authorization for a non-criminal grand jury investigation. Nor did the general assembly amend section 16–5–204 to permit non-criminal grand jury investigations when it enacted 16–5–205.5 in 1997.

As noted by the majority, section 16–5–204(3) addresses the scope of the grand jury's statutory authority. The statute authorizes:

> (3) Upon impanelment of each grand jury, the court shall give to each grand jury adequate and reasonable written notice of and shall assure that the grand jury reasonably understands the nature of:
>
> (a) Its *duty to inquire into offenses against the criminal laws of the state of Colorado* alleged to have been committed....
>
> (e) The duty of the grand jury by an affirmative vote of nine or more members of the grand jury to determine, based on the evidence presented before it, whether or not there is probable cause for finding indictments and to determine the violations to be included in any such indictments.

§ 16–5–204(4), 6 C.R.S. (2000)(emphasis added). Colorado grand jury law does not authorize grand juries to investigate and make recommendations concerning matters that do not involve possible criminal offenses.

I note that Colorado's grand jury report statute was modeled after Alaska R.Crim.P. 6.1. *See A Bill for an Act Concerning Release of Grand Jury Reports in Which No Indictment is Returned: Hearing on HB 97–1009 Before House Judiciary Comm.,* 61st General Assembly, 1st Sess. (Jan. 21, 1997) [hereinafter HB 97–1009]; § 16–5–204. Further, Alaska explicitly authorizes a grand jury to investigate and make recommendations concerning the public welfare or safety. *See* Alaska Stat. § 12.40.030 (2001). However, the Colorado general assembly did not expand the scope of grand jury investigatory authority to include matters of public welfare or safety when it enacted section 16–5–205.5. Therefore, the authority of Colorado grand juries to issue grand jury reports is more limited than in Alaska. In Colorado, allegations of possible criminal violations are required.

In addition, when interpreting legislative amendments, we assume that the general assembly was apprised of existing case law. *People v. McCullough,* 6 P.3d, 774, 778 (Colo. 2000); *see also Common Sense Alliance v. Davidson,* 995 P.2d 748, 754 (Colo.2000). In *Gher,* this court recognized that the grand jury has historically functioned as an investigatory body that serves as a buffer between the state and its citizens by screening accusations of criminal activity to determine whether evidence of criminal activity is so insubstantial that charges should not be brought. 183 Colo. at 318–19, 516 P.2d at 644. Thus, we held that the grand jury's broad investigatory powers extend only to matters that relate to possible criminal activity. *Id.* at 318, 516 P.2d at 644. They cannot be used to harass another governmental body for political reasons. *Id.* During the legislative debate surrounding the adoption of section 16–5–205.5, the general assembly frequently discussed the danger posed by the possible use of grand juries for political purposes. *See* HB 97–1009, *supra.* Therefore, I conclude that the legislature did not intend to overrule *Gher.*

This view is consistent with the requirement in the grand jury report statute that the reviewing court accept and file the report as a public report only if it satisfied that, "[t]he grand jury and the prosecuting attorney were acting within the statutory jurisdiction of such persons in convening the grand jury." § 16–5–205.5(4)(a). This requirement is independent from the trial court's duty to accept the certification of the district attorney and the jury foreman. *See* § 16–5–205.5(4)(b). Although it is argued that this requirement is limited to a review of whether the grand jury was properly impaneled, I would interpret it, consistent with *Gher,* to include the district attorney's presentation of a particular matter to a grand jury for investigation. Accordingly, I believe the statute requires the trial court to determine that the

prosecuting attorney and the grand jury acted within their statutory authority to investigate allegations of criminal activity before issuing a grand jury report.

In sum, because creating additional property owners to participate in this annexation dispute could not violate Colorado election law, it was not the proper focus of a grand jury proceeding. When the district attorney initiated this grand jury investigation, it should have been apparent to him that the criminal violations set forth in Colorado election law did not apply to these annexation proceedings. It was clear to the grand jury, as expressed in the grand jury report, that this conduct was not prohibited by law. Section 16–5–205.5 specifically requires the trial court to determine whether the grand jury and the prosecuting attorney were acting within their statutory jurisdiction in convening the grand jury. § 16–5–205.5(4)(a). Issuance of a grand jury report pursuant to section 16–5–205.5 thus presupposes a statutorily authorized grand jury investigation. Because the grand jury investigation in this case exceeded the statutory authority of the grand jury, the grand jury report should not be released pursuant to section 16–5–205.5. Accordingly, I would make the rule absolute.