In the Matter of the ESTATE OF
Matthew D. KEENAN, a pro-
tected person, Appellant,

v.

COLORADO STATE BANK
AND TRUST, Appellee.

No. 10CA0112.

Colorado Court of Appeals,
Div. V.

Feb. 17, 2011.

§ 24–51–1105, C.R.S.2010.

Morgan Legal Offices, P.C., Chester H. Morgan, Colorado Springs, Colorado, for Appellant.

Wade Ash Woods Hill & Farley, P.C., Herbert E. Tucker, Spencer J. Crona, Denver, Colorado, for Appellee.

Opinion by Judge WEBB.

When a protected person's cognition improves, a conservatorship may no longer be needed. And even if it is, disagreements with the conservator may warrant substitution of a new conservator for the protected person's best interests. Should a protected person who seeks to terminate a conservatorship, and failing that to replace the conservator, face not only opposition by the conservator but also the risk that the conservator's expenses in opposing him will be paid from the protected person's assets? At common law, such opposition to the protected person does not necessarily breach the conservator's fiduciary duty. And under section 15–14–417(3), C.R.S.2010, if the conservator acts reasonably and in good faith, the conservator should be compensated from assets subject to the conservatorship for expenses reasonably incurred in doing so.

Here, we conclude that the record supports the trial court's finding that as conservator for Matthew D. Keenan, Colorado State Bank and Trust (CSBT) acted reasonably and in good faith. However, we further conclude that additional findings are required concerning whether: the $1,945 CSBT paid itself for extraordinary services came from Keenan's income trust; the attorney fees CSBT incurred defending its accounting were reasonable; a full award of its fees and costs would be equitable; and ordering them to be paid from the conservatorship and trust was just. Therefore, we vacate the attorney fees and costs award, remand for such findings, and otherwise affirm.

## I. Background

Keenan is the beneficiary of a disability trust and an income trust funded by a multi-million dollar medical negligence settlement arising from a catastrophic brain injury. Initially, his mother was appointed guardian, conservator, and trustee of the income trust, while CSBT was appointed trustee of the disability trust. In 2005, Keenan moved to terminate the guardianship and conservatorship based on significant improvement in his cognition. By stipulation, CSBT was appointed as trustee of the income trust and conservator, and Anne Grasee was appointed as his limited guardian.

In 2007, the relationship between Keenan and Grasee soured. Among other disagreements between them, Keenan asserted that he was seeking to be "restored to capacity," while Grasee perceived his behavior as impatient, self-defeating, and inconsistent with her plan to develop his independence gradually. She sought legal advice and started dealing with Keenan through communications from her attorney to his attorney, but did not resign.

Grasee proposed to have Keenan evaluated by Stuart Kutz, Ph.D., a neuropsychologist.

Keenan discharged his attorney, who had agreed to the evaluation, requested pro se that the court "terminate any and all forms of guardianship," and secured new representation. His counsel supplemented the pro se request with a petition to terminate the conservatorship and opposed having to pay for the Kutz evaluation. Keenan submitted an evaluation from another neuropsychologist who found him unimpaired and recommended terminating both the guardianship and the conservatorship.

CSBT joined in Grasee's motion to appoint Kutz to evaluate Keenan, which the court granted with payment to be made from the disability trust or the conservatorship. In his October 9, 2007, report of the examination, Kutz concluded that Keenan no longer met the statutory definition of incapacity for guardianship. Grasee resigned shortly thereafter.

But using the standard of incapacity applicable to conservatorships, he also concluded that Keenan:

> [I]s unable to manage property and business affairs because he is unable to effectively receive or evaluate information, or both, or make decisions.... A professional fiduciary, such as a conservator and/or trustee, is indicated....

The report did not address changing fiduciaries. In later proceedings, Kutz testified to having told CSBT that he did not believe that excessively changing fiduciaries was in Keenan's best interests.

On October 15, 2007, Keenan proceeded to hearing on his petitions before Judge Sandstead. Initially, the court granted Grasee a decree of final discharge. The court then heard testimony, including from Keenan, who stated on cross-examination, "I don't have a problem with a conservator, ... [i]t's having this bank as my conservator." In colloquy at the end of the hearing, Keenan's counsel acknowledged that given Grasee's resignation and Keenan's statement, the focus should be on replacing CSBT as conservator.

By written order, the court maintained the conservatorship without addressing Keenan's capacity; recognized that Keenan could seek replacement of CSBT; and directed CSBT to assist Keenan in obtaining a new manual wheelchair and a portable electric wheelchair charger.

Keenan then moved under section 15–14–112(2), C.R.S.2010, to replace CSBT as conservator with Members Trust Company, based on opinions from his treatment providers that ongoing conflict with CSBT was detrimental to his mental health. CSBT opposed the motion and sought Keenan's medical records. On December 13, 2007, without holding a hearing, Judge Sandstead entered an order removing CSBT under the best interests standard; substituting Members Trust; and directing CSBT to file its final accounting.

Keenan proposed that CSBT absorb its attorney fees incurred in opposing termination of the conservatorship and substitution of Members Trust. Instead, CSBT filed its accounting, which included those fees. Keenan objected, primarily challenging CSBT's joinder in the motion for the Kutz examination; opposition to termination of the conservatorship; payment of bills of Kutz, of Grasee, of her counsel, and of its own counsel; payment of its "extraordinary" fees; failure to obtain a charger and a new wheelchair for him; opposition to substitution of Members Trust; and overall fiduciary administration. Discovery began.

On November 26, 2008, Judge Bailin took up CSBT's summary judgment motion and under C.R.C.P. 56(h) ruled that:

> CSBT had the right to oppose Mr. Keenan's motion to terminate, including requesting an evaluation, provided that it was acting reasonably and ... in good faith believed that termination was not in the best interests of Mr. Keenan because Mr. Keenan continued to be unable to manage his own assets....

The court did not address the propriety of CSBT's opposition to substituting Members Trust and ruled that Keenan's other objections raised factual issues concerning CSBT's good faith. Keenan filed but then withdrew a request for C.R.C.P. 54(b) certification of this order as a final judgment.

Following several days of hearings that included conflicting expert testimony on

CSBT's conduct, Judge Sandstead entered a lengthy written order. Applying the standard adopted by Judge Bailin, he found that CSBT had acted reasonably and in good faith. He rejected all of Keenan's challenges except the request for a portable electric charger and a new wheelchair. Concerning those two items, he found no breach of fiduciary duty and that "CSBT acted reasonably under the circumstances"; observed "those requests might have been handled better, an understatement"; and, "because it seems fair and just," ordered CSBT "to be surcharged in the amount of $5000.00."

Otherwise, Judge Sandstead approved as "reasonable and appropriate" all disputed expenditures incurred and payments made by CSBT during 2007, including fees of Grasee and her counsel; joinder in the motion to appoint Kutz and payment of his fees; participation in the October 15, 2007, hearing; and opposition to substituting Members Trust. Judge Sandstead retired.

CSBT petitioned for attorney fees of $198,126.80 and costs of $19,339.24 incurred defending its accounting. Keenan filed an opposition but did not request a hearing. Without holding a hearing, Judge Mulvahill, who had just been appointed, entered orders in the form tendered by CSBT awarding it all fees and costs requested, to be paid equally from the conservatorship and the disability trust.

## II.  Reasonably and In Good Faith Test

Keenan first contends Judge Bailin erred in articulating the legal standard as: "CSBT had the right to oppose Mr. Keenan's motion to terminate ... provided that it was acting reasonably and ... in good faith...." On de novo review, *see Sidman v. Sidman,* 240 P.3d 360, 362 (Colo.App.2009), we disagree.

### A.  Legal Standard for Opposing a Protected Person's Motion to Terminate the Conservatorship

#### 1.  Jurisdiction

■ Initially, we reject CSBT's assertion that Keenan "forfeited his right to appeal" this issue by withdrawing his motion to certify as a final judgment Judge Bailin's legal determination under C.R.C.P. 56(h). CSBT cites no authority supporting this assertion, nor have we found any in Colorado. To the contrary, where an interlocutory appeal may be taken, failure to do so does not foreclose review of the ruling after entry of final judgment. *See, e.g., Mountain Plains Constructors, Inc. v. Torrez,* 785 P.2d 928, 931 (Colo. 1990) (order denying motion to compel arbitration); *In re Nw. Mut. Life Ins. Co.,* 703 P.2d 1314, 1317 (Colo.App.1985) (order appointing receiver). We decline to adopt a different approach where the appeal did not even become permissive for lack of a C.R.C.P. 54(b) certification.

#### 2.  Merits

In articulating this legal standard, Judge Bailin relied primarily on sections 15–14–431(4) and 15–14–425, C.R.S.2010. Section 15–14–431(4) states in relevant part: "[B]efore terminating a conservatorship, the court shall follow the same procedures ... that apply to a petition for conservatorship." She reasoned that, because section 15–14–408, C.R.S.2010, requires a hearing in a conservatorship petition, section 15–14–431(4) "envisions a hearing" when a protected person moves to terminate the conservatorship.

Judge Bailin next noted, "Colorado law does envision that a conservator may, at least in some circumstances, oppose a protected person's motion to terminate," citing section 15–14–425(2)(x), C.R.S.2010. This section states, in relevant part:

> A conservator, acting reasonably and in an effort to accomplish the purpose of the appointment ... may ... [p]rosecute or defend actions, claims, or proceedings in any jurisdiction for the protection of assets of the estate and of the conservator in the performance of fiduciary duties.

##### a.  Common Law

Keenan first asserts that the "reasonably and in good faith" standard is contrary to common law conflict of interest principles for fiduciaries. We begin with this assertion because no statute specifically permits a conservator to oppose a protected person's motion to terminate the conservatorship, but

conclude that the common law does not support Keenan.

Keenan cites 39 Am. Jur. 2d *Guardian and Ward* § 162, which states that "[a]t common law, an action cannot be maintained between a guardian and a ward while that relation exists...." He also relies on Rule 6 of the National Guardianship Association's "Model Code of Ethics for Guardians" (Model Code) for the proposition that "[n]ot only is it a breach of fiduciary duty to oppose a plea for termination of the guardianship [or] conservatorship, the fiduciary is bound to assist the ward [or] protected person in doing so." Neither authority is persuasive.

Although 39 Am. Jur. 2d *Guardian and Ward* § 162 does not define "an action," the cases cited only prohibit a guardian from suing the ward while retaining control over the ward's estate. *See, e.g., Briggs v. Briggs,* 162 Tex. 177, 346 S.W.2d 106, 109 (1961) (quoting with approval *Kidd v. Prince,* 215 S.W. 844, 845 (Tex.Com.App.1919) ("incapacity [of the guardian] to sue [his ward] arises from the nature of the relationship of the parties")).

■ The common law impliedly allows a guardian or conservator to oppose the ward or protected person's motion to terminate the relationship by holding that a guardian or conservator could be paid out of the ward's or protected person's funds for, reasonably and in good faith, opposing the motion to terminate. *See In re Guardianship of Cookingham,* 45 Cal.2d 367, 289 P.2d 16, 19 (1955); *Conservatorship of Lefkowitz,* 50 Cal. App.4th 1310, 58 Cal.Rptr.2d 299, 302 (1996); *Woodruff v. Trust Co. of Georgia,* 233 Ga. 135, 210 S.E.2d 321, 325 (1974); *Palmer v. Palmer,* 38 N.H. 418, 420 (N.H.1859); *In re Larner,* 39 Misc. 377, 380–81, 79 N.Y.S. 836, 837–38 (N.Y.Sup.Ct.1902); *American Nat'l Bank v. Bradford,* 28 Tenn.App. 239, 188 S.W.2d 971, 980 (1945), *superseded in part on other grounds by* Tenn. R. Evid. 201, *as stated in Counts v. Bryan,* 182 S.W.3d 288, 291 (Tenn.Ct.App.2005).

In this regard, we discern no principled difference between a guardian and a conservator. *See, e.g., Morgan County Dep't of Human Services ex rel. Yeager,* 93 P.3d 589, 592 (Colo.App.2004) (noting that C.R.C.P.

17(c) refers to "a general guardian, conservator, or other like fiduciary"); § 15–10–201(19), C.R.S.2010 (" '[f]iduciary' includes a personal representative, guardian, conservator, and trustee").

■ The common law also recognizes that opposing a motion to terminate does not necessarily create a conflict of interest. While "a guardian does owe his ward the duty of undivided loyalty," *Bradford,* 188 S.W.2d at 979–80, "[not] every effort to release an incompetent person from restraint is of necessity friendly, and every effort to continue the restraint ... unfriendly," *Larner,* 39 Misc. at 379, 79 N.Y.S. at 837–38. Thus, while in

> some cases it would be an act of intolerable oppression for the guardian to oppose ... an application [to restore capacity], as where it is clear the ward has recovered and is restored in mind ... [,] in other cases the guardian's duty of loyalty would require him to oppose such an application, as where it is clear the ward is not recovered.

*Bradford,* 188 S.W.2d at 979–80.

Further, to discourage or prohibit a guardian from opposing a motion to restore capacity in every instance could "allow the petition for restoration to be considered without the presentation of all of the facts." *Cookingham,* 289 P.2d at 19. Such lack of evidence would prejudice protected persons where their interests "require that the guardianship should continue unrevoked." *See Palmer,* 38 N.H. at 420.

The Model Code was first proposed in Michael D. Casasanto et al., *A Model Code of Ethics for Guardians,* 11 Whittier L.Rev. 543 (1989). It has not been endorsed by the American Law Institute or any similar body as reflecting the common law. Keenan cites no appellate court decision adopting it on this basis, nor have we found any in Colorado.

Rule 6, which is followed by three subparts, reads: "The guardian has an affirmative obligation to seek termination or limitation of the guardianship *whenever indicated.*" *Id.* at 566 (emphasis added). The Model Code does not explain "whenever indicated."

Although subpart 3 notes that "[t]he guardian shall assist the ward in terminating or limiting the guardianship . . . ," the comments add that "where the guardian does not agree with the ward, [he should] arrang[e] for representation of the ward by independent legal counsel." *Id.* at 566–67.

■ Therefore, the common law does not persuade us to disavow Judge Bailin's "reasonably and in good faith" test.

### b. Statutory Provisions

Keenan also asserts that Judge Bailin erred in her statutory analysis. Again, we disagree.

We interpret statutes de novo, looking first to the plain language. *Granite State Ins. Co. v. Ken Caryl Ranch Master Ass'n,* 183 P.3d 563, 567 (Colo.2008). If the meaning is clear, we apply the statute as written. *Wells Fargo Bank v. Kopfman,* 226 P.3d 1068, 1072 (Colo.2010).

First, Keenan argues that a protective proceeding is not "an action, claim or proceeding" that a conservator can prosecute or defend under section 15–14–425(2)(x) which, he avers, "unmistakably applies to ordinary litigation." But Keenan cites no authority so limiting this provision, nor have we found any.

Further, because the statute encompasses "actions, claims, or proceedings," the term "proceedings" must be broader than "actions." *Cf. Scott v. Scott,* 136 P.3d 892, 896 (Colo.2006) ("the unsupervised administration of an estate may involve multiple proceedings"). And for reasons set forth in cases such as *Bradford* and *Cookingham,* allowing a conservator to oppose a motion to terminate would be "for the protection of assets of the estate," where the conservator had a good faith belief that the protected person remained unable to manage those assets.

Second, Keenan contrasts section 15–14–425(2)(x) with section 15–14–431(4), which he correctly asserts "says nothing about who, if anybody, could or should prosecute any opposition to termination." Therefore, he argues, "statutory construction should not be made to abrogate common law absent a clear declaration that such was intended." But because the common law allows a conservator or guardian to oppose the protected person's motion to terminate, reading the statute to prohibit that action, as Keenan advocates, would contravene the very principle he cites.

Third, Keenan argues that even if opposing the protected person's motion to terminate is not an impermissible conflict of interests, section 15–14–417(1) governs such opposition. CSBT counters that Judge Bailin's order should be upheld under section 15–14–417(3). Although Judge Bailin did not cite section 15–14–417(3) in her order, we agree that it, like the common law, impliedly supports the "reasonably and in good faith" standard she articulated.

Section 15–14–417, "Compensation, fees, costs, and expenses of administration—expenses," also does not address the propriety of a conservator opposing the protected person's motion to terminate. However, by specifying when payment of the conservator from the protected person's estate is appropriate, it implicitly authorizes the actions that trigger payment. For that reason, the standards that govern payments to the conservator also apply to the propriety of the conservator's underlying conduct.

The section contains six subsections, of which four are relevant here.[1] Subsection (1), "Compensation," states, in relevant part:

> If not otherwise compensated for services rendered, any visitor, guardian, conservator, special conservator, lawyer for the respondent, lawyer whose services resulted in a protective order or in an order beneficial to an incapacitated person or to a protected person's estate, any physician, guardian ad litem, or any other person appointed by the court is entitled to reasonable compensation from the estate even if no fiduciary is appointed.

Subsection (2), "Fees," enumerates factors to be considered when determining whether

---

1. Subsection (5) deals with the priority of paying costs and expenses after the death of an incapacitated or protected person.

fees incurred are reasonable, consistent with Colorado Rules of Professional Conduct 1.5, and is discussed more fully in Part IV, *infra*.

Subsection (3), "Expenses in estate litigation," states, in relevant part:

[I]f any guardian, conservator, special conservator, or court-appointed fiduciary defends or prosecutes any proceeding in good faith, whether successful or not, he or she is entitled to receive from the estate his or her necessary time, expenses, and disbursements including reasonable attorney fees incurred. Any such person or fiduciary who is unsuccessful in defending the propriety of his or her actions in a breach of fiduciary duty action shall not be entitled to recover expenses under this section to the extent of any matters on which such breaches are found.

Subsection (4) recognizes expenses incurred in defense of fiduciary fees, and is also discussed in Part IV, *infra*.

Keenan's assertion that subsection (1) controls is incorrect. He states that "[a]lthough subsection (1) does not specify (or limit) its application to protective proceedings, by clear implication that's what it means," but neither offers argument nor cites authority supporting this statement. *See, e.g., Bloom v. NCAA*, 93 P.3d 621, 623 (Colo.App.2004) (an assertion unsupported by specific argument or authority need not be addressed).

He also argues that because subsection (1) is more specific than subsection (3), the former takes precedence "to the extent inconsistent" with it. *See Crandall v. City & Cnty. of Denver*, 238 P.3d 659, 662 n. 2 (Colo.2010) (a specific statutory provision takes precedence over a more general one). But the plain language of subsection (3) deals expressly with litigation and its related expenses, including attorney fees. In contrast, subsection (1) applies more broadly to "ser-

vices rendered," and does not specify or limit the types of services eligible for compensation. Therefore, we conclude that because subsection (3) is more specific than subsection (1), it takes precedence where, as here, "estate litigation" is involved.[2]

Subsection (3) allows the conservator to collect expenses, including reasonable attorney fees, from the protected person's estate in good-faith defense of a proceeding. This comports with the common law and supports Judge Bailin's articulation of the "reasonably and in good faith" standard.[3]

■ Accordingly, we conclude that a conservator can reasonably and in good faith oppose a protected person's motion to terminate the conservatorship.

B. Legal Standard for Opposing a Protected Person's Motion to Substitute Conservators

■ Judge Bailin's C.R.C.P. 56(h) order did not address a conservator's opposition to a protected person's motion to substitute a new conservator. Nevertheless, Judge Sandstead applied the "reasonably and in good faith" standard to CSBT's opposition to Keenan's motion to replace it with Members Trust. Neither Keenan nor CSBT makes a separate argument as to the legal standard for opposing a motion to change conservators.

While a conservator's opposition to such a motion raises the spectre of self-dealing (see Sub–Part C, *infra*), for two reasons we decline to adopt a different standard in this context. First, the common law does not differentiate between opposing a motion to terminate the conservatorship and opposing a motion to change conservators. *See Conservatorship of Lefkowitz*, 58 Cal.Rptr.2d at

---

**2.** The term "litigation" is broadly defined. *See, e.g., In re R.H.*, 170 Cal.App.4th 678, 692, 88 Cal.Rptr.3d 650, 660 (2009) ("any civil action or proceeding"). And "estate" includes the property of any person "whose affairs are subject to this code." § 15–10–201(17), C.R.S.2010.

**3.** Because Keenan does not challenge this standard on the basis that "reasonably" and "in good faith" have different meanings, we leave for an-

other day the case where a fiduciary's conduct satisfies one but not the other.

We also decline to address Keenan's argument that the trial court could have exercised its discretionary power to appoint him a guardian ad litem under section 15–14–115, C.R.S.2010. Keenan does not explain why, in light of his pending motion to terminate the guardianship, appointing a guardian ad litem would have been a reasonable exercise of discretion.

301–02 (analyzing the later for reasonableness and good faith); *cf. In re Pelgram's Estate*, 146 Misc. 750, 262 N.Y.S. 848, 854–55 (N.Y.Sur.Ct.1933) (trust estate responsible for fees of trustee's attorney for opposing removal of co-trustee in good faith—up to point where further opposition became unreasonable). Second, a conservator's opposition to the protected person's motion to change conservators also constitutes "estate litigation" under section 15–14–417(3), for the reasons discussed in the preceding subsection.[4]

## C. Policy Considerations

We acknowledge Keenan's argument that personal autonomy will suffer if a protected person seeking to be restored to capacity must not only face opposition by the person's conservator but also risk paying for the conservator's opposition. And we agree that most conservators will have an inherent conflict of interest because maintaining the conservatorship and the conservator's appointment ensure that the conservator continues to be paid for managing the estate.[5]

■ But even where a statute is "troubling," a court "must resist the temptation to change the statutory language." *Common Sense Alliance v. Davidson*, 995 P.2d 748, 755 (Colo.2000). "It is not up to the court to make policy or to weigh policy." *Town of Telluride v. Lot Thirty–Four Venture, L.L.C.*, 3 P.3d 30, 38 (Colo.2000). Such action must be left to the General Assembly. *See, e.g., People v. Clendenin*, 232 P.3d 210, 218 (Colo.App.2009) (Loeb, J., specially concurring) (noting "anomaly" in medical marijuana amendment and suggesting "that some legislative action will be required if the . . . purposes of the amendment are to be fully effectuated").

## III. CSBT Acted Reasonably and in Good Faith

Keenan next contends Judge Sandstead erred by finding CSBT "acted reasonably and in good faith to protect the conservatorship and trust estates." We disagree.

"Reasonable" means "[f]air, proper, or moderate under the circumstances." *Black's Law Dictionary* 1379 (2009). " 'Good faith' has been defined in terms of both a subjective standard—*i.e.*, 'an intangible and abstract quality' that encompasses 'an honest belief'—and an objective standard—*i.e.*, 'freedom from knowledge of circumstances which ought to put the holder upon inquiry.' " *Lybarger v. People*, 807 P.2d 570, 577 (Colo.1991) (quoting *Black's Law Dictionary* 623 (1979)).

Acting reasonably is a fact question, *Heller v. First Nat'l Bank of Denver, N.A.*, 657 P.2d 992, 999 (Colo.App.1982), as is acting in good faith, *Woodruff*, 210 S.E.2d at 325. When the record shows a party's reasonableness, separate inquiry into good faith need not be undertaken absent evidence of bad faith. *See Lybarger*, 807 P.2d at 579–81; *cf. Knight v. Lawrence*, 19 Colo. 425, 432, 36 P. 242, 245 (1894) (observing that "[t]he law presumes that all men act in good faith until there is some evidence to the contrary").

We review a court's factual findings for clear error, *Schuler v. Oldervik*, 143 P.3d 1197, 1202 (Colo.App.2006), and reverse a finding only if it has no support in the record, *M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1383 (Colo.1994). When the record includes conflicting expert testimony, "[w]e review the trial court's resolution of that conflicting evidence under a highly deferential standard." *Bainbridge, Inc. v. Bd. of Cnty. Comm'rs*, 53 P.3d 646, 649 (Colo.App. 2001).

Here, Judge Sandstead heard conflicting testimony from experts for Keenan and

---

4. Because we resolve this issue on common law and statutory grounds, we need not address Judge Sandstead's statement that CSBT also had the right to "seek a hearing to review the sufficiency of cause for removal" under article 11.03 of Keenan's disability trust.

5. Such a conflict could be avoided if a conservator were to "petition the appointing court for instructions concerning fiduciary responsibility" under section 15–14–414(2), C.R.S.2010, before opposing the protected person's motion. However, doing so is discretionary. *See id.* ("[a] conservator *may* petition the . . . court") (emphasis added); *Jefferson County Bd. of Equalization v. Gerganoff*, 241 P.3d 932, 937 (Colo.2010) (" 'may' denotes a grant of discretion").

CSBT regarding the propriety of its actions in opposing Keenan's motions to terminate the conservatorship and to replace it as conservator. Keenan presented testimony from two experts that CSBT had acted unreasonably. However, the following testimony of CSBT's expert, Martha Ridgway, supports Judge Sandstead's finding that CSBT acted reasonably:

- CSBT had a duty to "act[ ] in a matter that was in [Keenan's] best interest and in the best interest of [his] funds...."

- Keenan's motion to terminate the conservatorship included "evaluations that he had gotten himself."

- It was appropriate for CSBT to "want[ ] to have an independent evaluation" from Kutz, who "didn't have an agenda."

- CSBT may have breached a fiduciary duty "if [it] hadn't made such a request because the prior evaluations ... were sought out by [Keenan,]" who "had an agenda."

- CSBT had a statutory right to petition the court to have Keenan evaluated.

- After Kutz's report, CSBT appropriately continued to oppose termination because "Kutz put in his report that Mr. Keenan ... admitted that he needed help with his money."

- CSBT may have been "extraordinarily exposed" to liability if it had not opposed termination because "not only did [it] have actual knowledge that Dr. Kutz ... had recommended ... continuation," but also "Keenan had admitted in prior reports that he felt he needed a fiduciary."

- "It would have been catastrophic had the money been turned over [to Keenan]."

- "Dr. Kutz advised several of the professionals in this case that he was very concerned with ... a churning pattern" of changing conservators that he felt "was not in Mr. Keenan's best interests."

- CSBT knew Kutz "was very concerned about this revolving door issue. And [CSBT] was quite concerned ... to make sure that changing fiduciaries was in

[Keenan's] best interests. So I think they had no choice but to do what they did."

Further, when asked, "Is there any indication that [CSBT] acted in bad faith?" Ridgway responded, "No, there's not." Nevertheless, in addition to his experts' testimony, Keenan asserts that CSBT did not act in good faith in opposing termination of the conservatorship because: Kutz's report was empirically weak; the report Keenan's psychologist submitted was more credible; and, in his evaluation of Keenan, "Kutz [did] not say that a conservatorship, and only a conservatorship, [was] required."

The first two assertions point only to conflicting evidence that is subject to our "highly deferential" review. *Bainbridge, Inc.,* 53 P.3d at 649. As to the third assertion, Keenan fails to address Kutz's testimony that "a limited conservatorship was indicated" and that, during the evaluation, Keenan "indicated to [Kutz] that he definitely felt that he needed a conservator."

Keenan further challenges CSBT's good faith by quoting part of a pre-mediation email exchange between CSBT's lawyer and Grasee's lawyer.[6] However, the full exchange, which occurred before Keenan moved to replace CSBT as conservator, shows that CSBT's desire to stay on was spurred, as its lawyer explained, by concern that Keenan's "statements ... contradict his motion to terminate ... and may provide proof that he recognizes that the basis for the conservatorship still exists...."

■ Accordingly, despite some significant evidence to the contrary, we conclude that Judge Sandstead did not clearly err in determining that CSBT acted reasonably and in good faith in opposing Keenan's motions.

## IV. Accounting Issues

Keenan next contends that even if CSBT acted reasonably and in good faith overall, Judge Sandstead erred in accepting CSBT's accounting because certain aspects of it were incomplete and unsubstantiated. We dis-

---

6. "The Bank's lawyer confided to the guardian's lawyer before the mediation that the Bank had already determined that it was unwilling to re- sign. The guardian's attorney responded, 'Frankly, I wouldn't go out of my way to find anything to offer in mediation.' "

agree, except as to the $1,945 CSBT paid itself for "extraordinary" services, on which we remand for further findings.

■ A fiduciary has a duty to provide "clear and accurate accountings...." *See Heller,* 657 P.2d at 997. Any fees paid to a guardian out of a protected person's estate must be "reasonable." *See* § 15–14–417(1). "The determination of reasonableness is a question of fact for the trial court which will not be disturbed on review unless it is patently erroneous and unsupported by the evidence." *Heller,* 657 P.2d at 999.

### A. Payments to Grasee

Keenan first argues that CSBT failed to provide a "clear and complete accounting" because it did not audit Grasee's invoices of payments to her lawyer.[7] We disagree.

The record supports Judge Sandstead's findings that CSBT's payments to Grasee were "reasonable, appropriate and based on billing statements submitted to CSBT" and that "CSBT's reliance on the review of Ms. Grasee, an experienced court-appointed professional guardian, of her own attorney['s] billing statements was appropriate." Keenan's expert, David Griffith, agreed that the invoices Grasee submitted to CSBT for payments to her lawyer appeared to be "itemized statements." Ridgway testified that the fees of Grasee's lawyer were reasonable and that, in turn, the fees CSBT paid to Grasee were reasonable and necessary. She also testified that it was "perfectly acceptable" for CSBT to rely on Grasee's review of her lawyer's bills.

### B. Claim of Being "Short–Changed"

Keenan next argues that he was "[s]hortchange[d] on his statutory entitlement" in the amount of roughly $4,000. But he does not claim that the money to which he may have been entitled was taken from his income trust, nor does he allege any other damages from nonpayment. Moreover, even if CSBT did not pay him the full amount due, the trust assets are now controlled by Members Trust, whom Keenan selected, and can be paid to him by Members Trust, if appropriate.

### C. CSBT's Payments After Removal

Keenan next argues that CSBT improperly paid fees to itself and its lawyers after having been removed as conservator and trustee. Initially, we note that Keenan does not indicate where he raised this issue below, as required by C.A.R. 28(k). However, because our review of the record discloses that his lawyer raised this issue in closing argument, we will address it here.

Keenan does not dispute that these payments were for expenses incurred before CSBT was replaced by Members Trust. He does not cite any authority, nor have we found any in Colorado, holding that a conservator breaches a duty by paying itself for expenses incurred while acting as conservator, after having been removed from that capacity. In any event, we need not resolve this legal question because Judge Sandstead found that CSBT was entitled to be paid for these expenses. Thus, we conclude that Keenan was not harmed because CSBT paid itself rather than releasing Keenan's funds to, and then billing, Members Trust.

### D. The $1,945 for "Extraordinary" Services

Keenan further asserts, and CSBT does not deny, that CSBT paid itself $1,945 for "extraordinary" services in violation of 10 Code Colo. Regs. 2505–10:8.100.7.E(6) and article IV of Keenan's income trust. But whether the $1,945 was paid out of the income trust was not addressed by Judge Sandstead and is unclear from the record. Hence, we remand for further findings.

■ Payments out of an income trust for "extraordinary" services are not authorized by section 15–14–412.7, C.R.S.2010, which

---

7. He also asserts that Grasee acted improperly by not personally contacting him for the five months preceding her resignation and that Judge Sandstead erred in not holding a hearing on his objection to releasing Grasee under a decree of discharge. But because Keenan does not identify any resulting damages, and the only apparent consequence of Grasee's alleged misconduct would be the propriety of CSBT's payments to her and her lawyer, on which Judge Sandstead did hold a hearing and which we address, we need not take up these assertions separately.

specifies income trust limitations. Colorado regulations governing income trusts permit "[a]n amount not to exceed $20.00 [to] be retained for trust expenses...." 10 Code Colo. Regs 2505–10:8.100.7.E(6)(a)(i)(b) & (f). The regulations also direct that "[n]o other deductions or expenses may be paid from the trust." 10 Code Colo. Regs. 2505–10:8.100.7.E(6)(a)(i)(e). And article IV of the income trust permits distribution of trust income only to the beneficiary's nursing facility, with any money remaining to be "retained and accumulated in the trust."

Judge Sandstead found that "CSBT's receipt of percentage and of Extraordinary Fees [was] reasonable and appropriate under the circumstances...." But we cannot discern from the record whether this finding included the $1,945, nor can we tell whether CSBT paid this amount from the income trust or another account. On remand, should the trial court conclude that the $1,945 was paid from the income trust, then Keenan is to be credited by this amount and CSBT debited for its attendant fees.

## V. Fees and Costs

Finally, Keenan contests the award of attorney fees and costs that CSBT incurred in defending its accounting. We conclude that further findings are required, vacate the award, and remand.

Following entry of Judge Sandstead's order and his retirement, CSBT presented separate motions to Judge Mulvahill for $198,126.80 in attorney fees and $19,339.24 in costs incurred defending its accounting. He adopted CSBT's orders verbatim[8] and awarded CSBT all of the fees and costs that it had requested. The order approving attorney fees recited that section 15–14–417(3) "entitles a conservator to reimbursement if defense of claims is in good faith and no breach of fiduciary duty is found"; that Judge Sandstead's order "found that [CSBT] acted in good faith and did not breach any fiduciary duty owed"; and that CSBT's attorney fees "are just and reasonable and a

benefit to the Estate and Trust." The order approving CSBT's costs did not state any separate reasons.

Initially, we acknowledge Keenan's assertion that "[t]he court granted the entirety of [CSBT's] claim [for fees and costs] without discussion or hearing." But he does not assert that he requested a hearing, nor do we find any such request in the record. Therefore, we conclude that he waived any right to a hearing on the issue. *See In re Marriage of Ensminger,* 209 P.3d 1163, 1167 (Colo.App. 2008).

Keenan next asserts that Judge Mulvahill should have applied section 15–14–417(1) to CSBT's request because a conservator's actions must benefit the protected person. CSBT counters that section 15–14–417(3) was the correct standard because a fiduciary is entitled to reasonable attorney fees for successfully defending the propriety of its actions against a breach of fiduciary duty claim. Reviewing de novo whether the trial court applied the correct legal standard, *see, e.g., Bonidy v. Vail Valley Center for Aesthetic Dentistry, P.C.,* 232 P.3d 277, 283 (Colo.App. 2010), we reject both positions.

Keenan's assertion that section 15–14–417(1) governs because a conservator's actions must benefit the protected person is unpersuasive since CSBT was no longer Keenan's conservator when it defended its accounting, and Judge Sandstead had already addressed the propriety of its underlying conduct as conservator.

CSBT's argument is equally unavailing. Section 15–14–417(3) precludes recovery of expenses by a fiduciary "who is unsuccessful in defending the propriety of his or her actions in a breach of fiduciary duty action...." Even if CSBT is correct that by negative implication a successful fiduciary may recover fees, here CSBT was defending the accounting that Judge Sandstead ordered it to file. The accounting was not a separate "breach of fiduciary duty *action*" commenced by Keenan.

---

8. The proposed orders left blanks for the amount of fees, the date, and Judge Mulvahill's signature. Because the trial court made no independent findings, we scrutinize the orders "more critical-ly than if they were produced by the trial court itself." *Trask v. Nozisko,* 134 P.3d 544, 549 (Colo.App.2006).

Rather, we conclude that Judge Mulvahill should have applied sections 15–14–417(2) and 15–14–417(4) for the following two reasons.

First, as discussed above, section 15–14–417(2) lists several factors "to be considered as guides in determining the reasonableness of *any fee* referred to in this section or *in this article*" (emphasis added). *See Kauntz v. HCA–Healthone, LLC,* 174 P.3d 813, 817 (Colo.App.2007) (" 'Any' means 'all.' "). Therefore, on its face, section 15–14–417(2) applies to a claim for attorney fees that a conservator incurs, including fees in defense of its accounting, because such fees arise from protective proceedings under section 15–14–101, C.R.S.2010.

Second, section 15–14–417(4) deals specifically with expenses "incurred in the defense of the fiduciary's fees and costs" when "any fiduciary is required to defend [them]." Even if such a proceeding might also fall within the general language of sections 15–14–417(1) or 15–14–417(3), the more specific provision controls. *See, e.g., Crandall,* 238 P.3d at 662 n. 2.

Here, CSBT filed its accounting of the fees and costs it spent in opposing Keenan's motions to terminate the conservatorship and to replace it as conservator. Keenan objected. In defending the accounting, it incurred further expenses, primarily attorney fees, which fall within the specific provisions of section 15–14–417(4).

We are not persuaded otherwise by Keenan's assertion that section 15–14–417(4) is inapplicable because CSBT was not "required" to defend its underlying fees and costs. Specifically, he argues that CSBT "refused each and every opportunity to avoid expensive litigation" and that it is "well established that a missed opportunity to avoid trial constitutes a failure to mitigate and is a relevant factor in considering the award of attorney fees." This assertion raises two separate issues, one as to the applicability of section 15–14–417(4) and the other as to reasonableness under section 15–14–417(2). We disagree with Keenan as to the first issue

and include the second issue in our remand order.

Regardless of whether CSBT "refused ... opportunit[ies] to avoid ... litigation," Keenan objected to CSBT's final accounting, asserting that CSBT "actually spent [Keenan's] money to inflict financial, emotional, psychological, and physical harm." Therefore, CSBT's defense of its accounting was required. *Cf. Butler v. Lembeck,* 182 P.3d 1185, 1190 (Colo.App.2007) ("[H]omeowner was 'required' to initiate legal action against tenants to obtain the relief she sought, because tenants denied that they were liable to her for the asserted damages.").

As to the reasonableness of fees under section 15–14–417(2), failure to explore settlement is not a factor listed. While section 13–17–103(1)(h), C.R.S.2010, includes offers of settlement among considerations for determining the reasonableness of fees, Keenan cites no authority applying it to estate litigation or protective proceedings, nor are we aware of any. However, the enumerated factors under section 15–14–417(2) are not exhaustive, and section 15–14–417(4) does not limit the grounds for determining what is "equitable under the circumstances." Hence, the underlying factual issue may, but need not, be considered on remand.[9]

Finally, Keenan asserts that even if section 15–14–417(4) applies, the amount CSBT spent defending its accounting was unreasonable and excessive, given: his alleged status as the "winning party"; the amount in controversy; and Judge Sandstead's $5000 surcharge against CSBT on the wheelchair/charger issue.

Whether Keenan was the prevailing party for purposes of an attorney fees award is a discretionary decision for the trial court. *See Anderson v. Pursell,* 244 P.3d 1188, 1193–94 (Colo.2010) ("the trial court is in the best position to observe the course of the litigation and to determine which party ultimately prevailed"). The trial court should address this issue on remand, including findings on how Keenan's success in having CSBT re-

9. We express no opinion on the applicability of either CRE 408 or section 13–22–307, C.R.S. 2010, to Keenan's argument.

placed as conservator affects reasonableness under section 15–14–417(2) or what is "equitable" under section 15–14–417(4).

Section 15–14–417(2)(d) includes "[t]he amount involved and the results obtained" among the "reasonableness" factors. Because the parties dispute the amount of fees and costs CSBT incurred in the proceedings before it was replaced as conservator, the trial court should resolve this dispute on remand. The court should also address whether awarding CSBT all of the attorney fees requested is at odds with the surcharge on the wheelchair/charger issue.

Factual underpinnings likewise favor remand to resolve Keenan's assertion that under section 15–14–417(4), equity lies with him because of the "relative financial position of the parties involved." While this factor—like settlement—appears in section 13–17–103, it finds no mention in section 15–14–417(2). However, because in an equity case a court has "broad and flexible discretionary powers," *Flank Oil Co. v. Tennessee Gas Transmission Co.*, 141 Colo. 554, 568, 349 P.2d 1005, 1013 (1960), on remand the trial court may, but need not, consider this factor in determining what award is "equitable under the circumstances."

Finally, we cannot accept the reference to "reasonable" and "just" in the court's order as sufficient because it does not mention either section 15–14–417(2) or section 15–14–417(4), nor does it address the factors in section 15–14–417(2), but rather cites only section 15–14–417(3). Therefore, we remand with instructions to make specific and independent findings whether: the fees sought are reasonable under the factors in section 15–14–417(2); awarding the fees and costs to CSBT is "equitable under the circumstances of the case," section 15–14–417(4); and ordering them to be paid from the conservatorship and trust is "just," *id. See, e.g., Federal Ins. Co. v. Ferrellgas, Inc.*, 961 P.2d 511, 515 (Colo.App.1997) ("A party is ... entitled to have the trial court make findings sufficient to disclose the basis for its decision to award costs and to support the amount awarded."); *cf. Dahl v. Young*, 862 P.2d 969, 973 (Colo. App.1993) (vacating and remanding award of attorney fees under section 38–35–109(3) for

trial court to make specific findings of reasonableness).

On remand, the court shall make specific findings and may, but need not, hold a further hearing.

## VI. Conclusion

The orders are affirmed in part and vacated in part, and the case is remanded for further proceedings consistent with this opinion.

Judge GRAHAM and Judge J. JONES concur.